John Magee
71 Ontario Street
Honeoye Falls, NY 14472
(585) 624-9306

March 6, 2007

MetLife
Attention Appeals Unit
PO Box 14592
Lexington, KY 40511-4592

RE: ITT Industries, Inc.
Long Term Disability
Claim No.: 640407128904
Group No.: 303299
Emp ID No.: 620820

To Whom It May Concern:

This letter is in reference to a document that I have received from MetLife[1] dated July 20, 2006 regarding the termination of my long term disability benefits.

In response to the reasoning offered in said letter (and the general reasoning, inconsistencies and inaccuracies used throughout my entire long term disability period with MetLife) I will try to detail the mistaken assumptions made during the Physician's File Review (PFR) by Dr. Payne (and that of other MetLife employed health care workers over the entire time this claim was active) and the apparent subsequent arbitrariness and capriciousness of MetLife's decision to terminate my benefits.

My case manager has been as helpful as I believe he can in this situation and my comments are in no way a reflection of the people that I have had direct contact with. I have tried to be objective in my review of this file, and as it has taken much for me to write I would appreciate (and expect) that it be given due consideration during this appeal. Any of my opinions are voiced in the hopes that MetLife as a company change it policies and practices in general, and especially for those who suffer from Chronic Fatigue Syndrome as recognized by the Centers for Disease Control. If I may offer further details or materials that will help in properly adjudicating this claim, please feel free to contact me. Thank you for your consideration in this matter.

John Magee

---

1  See Appendix A for a copy of MetLife's termination letter of Benefits

# Personal History

I would like to offer the following statement and history as an account to try and sum up and to document how I have gotten to this point of appealing the unjust decision of MetLife to terminate my benefits.

As background, I am a 47 year happily married old father of five (5) children. Some time ago, I began having weakness in my legs. As I had had several back surgeries (laminectomies/discectomies) I of course assumed that it was because of damage during the surgeries. I went to see my neuro-surgeon once again and upon examination and MR testing, he thought he detected stenosis in the lower vertebrae that may account for the generalized weakness and tiredness I felt. I had one more surgery (foraminotomy) to correct this problem and it turned out to be the worst experience of the five surgeries. After surgery, I began to experience sweats and chills. I developed pneumonia and even with the antibiotics took weeks to heal. The surgery did not solve the issue with my legs, and I noticed that the muscle "fatigue" that I had been experiencing was noticeable in all of my limbs. I began to feel like I had contracted an extended version of the "flu." As my personality lends itself to be extremely active and self motivated, I did not like being "sidelined" for any length of time. I sought out the help of my doctor. I was referred to the neurology chief of the local hospital and subjected myself to numerous procedures looking for such things as muscular dystrophy, multiple sclerosis, nerve damage etc. After a full battery of tests which showed slight abnormalities but no definitive coherent diagnosis, the neurologist suggested the possibility of Chronic Fatigue Syndrome (CFS). As I had never heard of it before he explained to me the symptomatology and the fact that there was no definitive test to prove that it was what was afflicting me. As I question whether he believed that this was a true illness or not, he replied that he had seen far too many credible people such as myself plagued by the same type of symptoms for it not to be real. He then referred me back to my Principle Care Physician (PCP) with a recommendation that she refer me to a rheumatologist.

I was referred to Dr. James Ross who listened to my history and completed an exam, along with several tests, at which time he diagnosis me with Chronic Fatigue Syndrome and orthostatic intolerance. He told me that many people with CFS found some relief through the use of low doses of antidepressants as well as nutritional supplements. He started me on Celebrex, Celexa and $CoQ_{10}$. Unfortunately I was only able to continue with Dr. Ross for a short time as he left the area shortly after I began with him. I started going back to my regular PCP who offered very little in the way of hope or treatment.

After the departure of Dr. Ross I started doing research on this disease. I read about a study going on at the University of New Jersey being directed by Dr. B. Natelson. I contacted the number for the study and was invited down to see if I would qualify for the study. I was examined by Dr. Natelson and his staff who confirmed the diagnosis as CFS. I participated in several different studies including a neuro-cognitive study. As these were blind studies I did not find out the specifics of my performance, but I remember the simple sequential math problems as being a real challenge for me, and causing worsening headaches the more I would do. In conversations with him and his staff they suggested that since I lived in upstate NY that I should contact Dr. David Bell, who was an expert in dealing with CFS.

ML0122

At the same time I was going through this long period of being diagnosed and treated I was starting to feel sad as my activities were becoming more and more restricted. At the time I had four (4) children and was extremely active raising them (boy scouts, baseball, swimming lessons etc.), in my work life (working 50-60 hours per week) and restoring an 1820 farmhouse. My typical day was to wake up at 5:30am, get to the Y by 6am, swim for an hour (exercise for my back), get dressed and get to work by 7:30am, work until 6pm; come home for dinner and spend the early evening helping the kids with home work, getting them bathed and tucked in by 9pm. I would then spend the next couple of hours with my wife watching TV etc. I would then tuck her in and begin to either work on a project on the house or work on a car (a hobby of mine) until 1:00 am. I would then get up the next day and do it all over again, and I was feeling very fulfilled and happy. As muscle fatigue and soreness set in, I was forced to reduce the things that I loved to do. First, I could no longer keep up the late nights doing what I enjoyed. As I would wake up in the morning feeling un-rested and like I had just run a marathon, getting to the Y became problematic. In addition, on the days that I could make it, the muscle fatigue made it impossible to complete an effective workout (I was use to swimming at least a mile per day). My legs and arms would become tired and ache after only several laps. As time went on it would only take a couple of laps before I could no longer keep myself afloat, let alone force myself to swim further. As the malaise continued to grow, I would no longer be able to actively interact with my kids. Thinking as I imagine many people do, I believed that the most important thing that I could do for both me and my family was to devote myself to work so that we would have financial security and that I could at least keep that sense of self that I had developed through my career. Looking back on all those things that I was forced to curtail due to this illness, it is not surprising that my mood took a turn for the worse. My day had turned from being fulfilling to having to force myself to get up in the morning, battle headaches and problems with short term memory and my ability to do math (not good for someone who relies greatly on statistics to properly do his/her job), come home and have to crash on the couch as soon as I walked in. Many days I would not even be able to sit upright at the table for dinner with my family. At that point I believe that my symptoms "plateaued." Even though it was not an ideal situation for me, at least I was able to continue to work and earn the necessary monies for us to live on.

As can be seen from my performance appraisals at work[2], I did manage for a number of years to keep my illness from affecting my job. I tried to do whatever was necessary of me to perform well and be a contributing member. I made modifications in work habits to compensate for the symptoms I was having. I would no longer depend on my memory but would carry a steno book and keep notes. I adjusted my chair and computer desk such that I could essentially lie back as I wrote and researched. In the mean time I continued to research options for the treatment of CFS and tried many different regimens in an effort to improve my quality of life and to be able to keep up with the demands of my profession. These efforts included following protocols suggested by Dr. Bell (such as physical therapy, exercise therapy, drug therapy and saline infusions, all of which had met with some limited success with some of his patients), treatments suggested by other doctors (trigger-point injections) and extending outside of the mainstream medical community in trying acupuncture, hypnosis, massage therapy, myofascial release, meditation, empathetic healing, reiki healing, chiropracty, specific chiropracty (realignment of the neck vertebrae specifically). I even changed to a PCP (Dr. Kates) who was a holistic provider that believed in healing power of crystals and spirit. At one point I was even

---

2  Please see Appendix 2 for copies of my last three (3) PA's

considering "brain surgery" (until my neuro-surgeon talked me out of it) by a doctor who was featured on 20/20 as being able to help those with CFS (this treatment was later discredited). My dedication to my family and my job led me to continue to look for ways that I might get better, even though many of these "treatments" had to be paid out of pocket and seemed at times to be nonsensical and extreme to me.

In fact it was my dedication to job is the most likely caused my dropping off that plateau I had established. In order to do my job properly I was required to travel. Every one of these trips would be work intensive, typically requiring working 12 to 14 hours a day. As seems anecdotal with CFS, if a person tries to push themselves beyond what their body will allow, they may experience an extreme worsening of symptoms. The traveling took a lot out of me and after several extended trips forced to go out of work on STD to try and recover. Throughout this time on STD I frantically searched for some type of solution trying even more and more outlandish trials looking for enough relief to get me back to work. As my short term benefits began to run out, I tried to return back to work by sheer will alone. I managed to "get by" by using vacation days when I absolutely could not get out of bed and carefully pacing my activities at work. Even with those modifications it was obvious that my performance had begun to decline. I could no longer keep track of meetings, statistics, articles and various other data that was paramount in my job. I remember one instance specifically where I was asked if I would write the document that outlined the Assembly, Integration, and Testing (AI&T) of a satellite and its components. As I sat down to write I looked for a template that I was sure that I had previously created. I discovered in my files that the AI&T document I was just starting had already been completed several weeks previously by me. I had no memory of ever writing that 70+ page technical document. My job again required multiple trips which again set me on a downward spiral. I could no longer get to work on time, and when I got there, I felt completely useless. My head hurt to think, it was painful to move and I accomplish very little (if anything). From that point on I have been unable to work in any capacity.

Leaving my job was not an easy decision for me. Over the past decade I had rationalized having to live with the limits in my life with the fact that I could at least work, and do well at it. My self-worth and esteem were directly tied to being a productive member of society and caring for my family. I had a lot of pride and wanted to earn what I received. Becoming disabled by CFS was one of the worst things that could happen to someone like me. In the medical documentation that is in MetLife's possession the word depression is used. I would not call myself depressed but rather sad, as someone who has lost a person close to them. Life is never quite the same.

My pain, fatigue and poor stamina keep me from doing much work now. I feel physically tired and in pain even when I do nothing. If I am active for a half hour, even sitting, my pain will get worse. At times I will try to push beyond the pain and fatigue, but if I repeatedly push my limits, the pain worsens, seeming to accumulate with the total activity of the day. On good days the total amount of time I can do even intermittent activity is very limited, e.g. a total of a couple of hours. If I force myself beyond these limits my pain usually flares for 24 hours or more. These flare-ups might begin several hours later or the next day (which is common) or even several days later. If I push for several days in a row, then the delayed flare ups will be much more severe, and will last longer.

Metropolitan Life Insurance Company
MetLife  Disability, PO Box 14592, Lexington KY 40511-4592
Fax:  1-800-230-9531

# MetLife

## MetLife Disability Appeal Request Form

*Important:  This form must be returned with a request for an appeal review.*

Claim #:  640407128904
Employee Name:  JOHN MAGEE
Employer:  ITT CORPORATION

Date: 3/6/07
Report #:  303299

## Request for Claim Review

**Instructions:**  This form should be submitted with any request for a review of our claim decision.  You may use the space below to indicate why you believe our claim determination was incorrect.  You may attach additional pages or information, if it is pertinent to your request.

- CFS is a real disease w/ Functional Capability limitations. Please see following

- Also, Dr. Bell (my PCP) will be sending in the results of newer tests & his diagnosis.

Any questions, please let me know

John Magee

(585) 624-9306

ML0125

8/1/09

CF5 is a real disease of Church and Cupbility Institution. Please see following.

Also, Dr. Gall (my Dr.) will be sending in the results of more test if he diagnosis.

Any questions, please let me know

[signature]

(631) 664-9506

ML0126

John Magee
71 Ontario Street
Honeoye Falls, NY 14472
(585) 624-9306

March 6, 2007

MetLife
Attention Appeals Unit
PO Box 14592
Lexington, KY 40511-4592

RE: ITT Industries, Inc.
Long Term Disability
Claim No.: 640407128904
Group No.: 303299
Emp ID No.: 620820

To Whom It May Concern:

This letter is in reference to a document that I have received from MetLife[1] dated July 20, 2006 regarding the termination of my long term disability benefits.

In response to the reasoning offered in said letter (and the general reasoning, inconsistencies and inaccuracies used throughout my entire long term disability period with MetLife) I will try to detail the mistaken assumptions made during the Physician's File Review (PFR) by Dr. Payne (and that of other MetLife employed health care workers over the entire time this claim was active) and the apparent subsequent arbitrariness and capriciousness of MetLife's decision to terminate my benefits.

My case manager has been as helpful as I believe he can in this situation and my comments are in no way a reflection of the people that I have had direct contact with. I have tried to be objective in my review of this file, and as it has taken much for me to write I would appreciate (and expect) that it be given due consideration during this appeal. Any of my opinions are voiced in the hopes that MetLife as a company change it policies and practices in general, and especially for those who suffer from Chronic Fatigue Syndrome as recognized by the Centers for Disease Control. If I may offer further details or materials that will help in properly adjudicating this claim, please feel free to contact me. Thank you for your consideration in this matter.

John Magee

---

1    See Appendix A for a copy of MetLife's termination letter of Benefits

ML0127

# Personal History

I would like to offer the following statement and history as an account to try and sum up and to document how I have gotten to this point of appealing the unjust decision of MetLife to terminate my benefits.

As background, I am a 47 year happily married old father of five (5) children. Some time ago, I began having weakness in my legs. As I had had several back surgeries (laminectomies/discectomies) I of course assumed that it was because of damage during the surgeries. I went to see my neuro-surgeon once again and upon examination and MR testing, he thought he detected stenosis in the lower vertebrae that may account for the generalized weakness and tiredness I felt. I had one more surgery (foraminotomy) to correct this problem and it turned out to be the worst experience of the five surgeries. After surgery, I began to experience sweats and chills. I developed pneumonia and even with the antibiotics took weeks to heal. The surgery did not solve the issue with my legs, and I noticed that the muscle "fatigue" that I had been experiencing was noticeable in all of my limbs. I began to feel like I had contracted an extended version of the "flu." As my personality lends itself to be extremely active and self motivated, I did not like being "sidelined" for any length of time. I sought out the help of my doctor. I was referred to the neurology chief of the local hospital and subjected myself to numerous procedures looking for such things as muscular dystrophy, multiple sclerosis, nerve damage etc. After a full battery of tests which showed slight abnormalities but no definitive coherent diagnosis, the neurologist suggested the possibility of Chronic Fatigue Syndrome (CFS). As I had never heard of it before he explained to me the symptomatology and the fact that there was no definitive test to prove that it was what was afflicting me. As I question whether he believed that this was a true illness or not, he replied that he had seen far too many credible people such as myself plagued by the same type of symptoms for it not to be real. He then referred me back to my Principle Care Physician (PCP) with a recommendation that she refer me to a rheumatologist.

I was referred to Dr. James Ross who listened to my history and completed an exam, along with several tests, at which time he diagnosis me with Chronic Fatigue Syndrome and orthostatic intolerance. He told me that many people with CFS found some relief through the use of low doses of antidepressants as well as nutritional supplements. He started me on Celebrex, Celexa and $CoQ_{10}$. Unfortunately I was only able to continue with Dr. Ross for a short time as he left the area shortly after I began with him. I started going back to my regular PCP who offered very little in the way of hope or treatment.

After the departure of Dr. Ross I started doing research on this disease. I read about a study going on at the University of New Jersey being directed by Dr. B. Natelson. I contacted the number for the study and was invited down to see if I would qualify for the study. I was examined by Dr. Natelson and his staff who confirmed the diagnosis as CFS. I participated in several different studies including a neuro-cognitive study. As these were blind studies I did not find out the specifics of my performance, but I remember the simple sequential math problems as being a real challenge for me, and causing worsening headaches the more I would do. In conversations with him and his staff they suggested that since I lived in upstate NY that I should contact Dr. David Bell, who was an expert in dealing with CFS.

ML0128

At the same time I was going through this long period of being diagnosed and treated I was starting to feel sad as my activities were becoming more and more restricted. At the time I had four (4) children and was extremely active raising them (boy scouts, baseball, swimming lessons etc.), in my work life (working 50-60 hours per week) and restoring an 1820 farmhouse. My typical day was to wake up at 5:30am, get to the Y by 6am, swim for an hour (exercise for my back), get dressed and get to work by 7:30am, work until 6pm; come home for dinner and spend the early evening helping the kids with home work, getting them bathed and tucked in by 9pm. I would then spend the next couple of hours with my wife watching TV etc. I would then tuck her in and begin to either work on a project on the house or work on a car (a hobby of mine) until 1:00 am. I would then get up the next day and do it all over again, and I was feeling very fulfilled and happy. As muscle fatigue and soreness set in, I was forced to reduce the things that I loved to do. First, I could no longer keep up the late nights doing what I enjoyed. As I would wake up in the morning feeling un-rested and like I had just run a marathon, getting to the Y became problematic. In addition, on the days that I could make it, the muscle fatigue made it impossible to complete an effective workout (I was use to swimming at least a mile per day). My legs and arms would become tired and ache after only several laps. As time went on it would only take a couple of laps before I could no longer keep myself afloat, let alone force myself to swim further. As the malaise continued to grow, I would no longer be able to actively interact with my kids. Thinking as I imagine many people do, I believed that the most important thing that I could do for both me and my family was to devote myself to work so that we would have financial security and that I could at least keep that sense of self that I had developed through my career. Looking back on all those things that I was forced to curtail due to this illness, it is not surprising that my mood took a turn for the worse. My day had turned from fulfilling to having to force myself to get up in the morning, battle headaches and problems with short term memory and my ability to do math (not good for someone who relies greatly on statistics to properly do his/her job), come home and have to crash on the couch as soon as I walked in. Many days I would not even be able to sit upright at the table for dinner with my family. At that point I believe that my symptoms "plateaued." Even though it was not an ideal situation for me, at least I was able to continue to work and earn the necessary monies for us to live on.

As can be seen from my performance appraisals at work[2], I did manage for a number of years to keep my illness from affecting my job. I tried to do whatever was necessary of me to perform well and be a contributing member. I made modifications in work habits to compensate for the symptoms I was having. I would no longer depend on my memory but would carry a steno book and keep notes. I adjusted my chair and computer desk such that I could essentially lie back as I wrote and researched. In the mean time I continued to research options for the treatment of CFS and tried many different regimens in an effort to improve my quality of life and to be able to keep up with the demands of my profession. These efforts included following protocols suggested by Dr. Bell (such as physical therapy, exercise therapy, drug therapy and saline infusions, all of which had met with some limited success with some of his patients), treatments suggested by other doctors (trigger-point injections) and extending outside of the mainstream medical community in trying acupuncture, hypnosis, massage therapy, myofascial release, meditation, empathetic healing, reiki healing, chiropracty, specific chiropracty (realignment of the neck vertebrae specifically). I even changed to a PCP (Dr. Kates) who was a holistic provider that believed in healing power of crystals and spirit. At one point I was even

---

2  Please see Appendix 2 for copies of my last three (3) PA's

considering "brain surgery" (until my neuro-surgeon talked me out of it) by a doctor who was featured on 20/20 as being able to help those with CFS (this treatment was later discredited). My dedication to my family and my job led me to continue to look for ways that I might get better, even though many of these "treatments" had to be paid out of pocket and seemed at times to be nonsensical and extreme to me.

In fact it was my dedication to job is the most likely caused my dropping off that plateau I had established. In order to do my job properly I was required to travel. Every one of these trips would be work intensive, typically requiring working 12 to 14 hours a day. As seems anecdotal with CFS, if a person tries to push themselves beyond what their body will allow, they may experience an extreme worsening of symptoms. The traveling took a lot out of me and after several extended trips forced to go out of work on STD to try and recover. Throughout this time on STD I frantically searched for some type of solution trying even more and more outlandish trials looking for enough relief to get me back to work. As my short term benefits began to run out, I tried to return back to work by sheer will alone. I managed to "get by" by using vacation days when I absolutely could not get out of bed and carefully pacing my activities at work. Even with those modifications it was obvious that my performance had begun to decline. I could no longer keep track of meetings, statistics, articles and various other data that was paramount in my job. I remember one instance specifically where I was asked if I would write the document that outlined the Assembly, Integration, and Testing (AI&T) of a satellite and its components. As I sat down to write I looked for a template that I was sure that I had previously created. I discovered in my files that the AI&T document I was just starting had already been completed several weeks previously by me. I had no memory of ever writing that 70+ page technical document. My job again required multiple trips which again set me on a downward spiral. I could no longer get to work on time, and when I got there, I felt completely useless. My head hurt to think, it was painful to move and I accomplish very little (if anything). From that point on I have been unable to work in any capacity.

Leaving my job was not an easy decision for me. Over the past decade I had rationalized having to live with the limits in my life with the fact that I could at least work, and do well at it. My self-worth and esteem were directly tied to being a productive member of society and caring for my family. I had a lot of pride and wanted to earn what I received. Becoming disabled by CFS was one of the worst things that could happen to someone like me. In the medical documentation that is in MetLife's possession the word depression is used. I would not call myself depressed but rather sad, as someone who has lost a person close to them. Life is never quite the same.

My pain, fatigue and poor stamina keep me from doing much work now. I feel physically tired and in pain even when I do nothing. If I am active for a half hour, even sitting, my pain will get worse. At times I will try to push beyond the pain and fatigue, but if I repeatedly push my limits, the pain worsens, seeming to accumulate with the total activity of the day. On good days the total amount of time I can do even intermittent activity is very limited, e.g. a total of a couple of hours. If I force myself beyond these limits my pain usually flares for 24 hours or more. These flare-ups might begin several hours later or the next day (which is common) or even several days later. If I push for several days in a row, then the delayed flare ups will be much more severe, and will last longer.

Also true for me at this time is that my mental concentration is poor. If I do substantial mental or physical activity my ability to concentrate worsens. It appears that the more I do the worse I get. I used to be able to read technical articles and follow what's happening in meetings. Now I have to reread even the simplest of articles to try to understand them and miss much that is talked about in my children's lives. I cannot seem to pick up and retain facts. I can usually do okay in normal conversations, but have trouble "finding" words. Even trying to help my children with their homework can be exhausting. I can last for a few minutes, and then my head starts to hurt. The harder I think, the more confused I get, my concentration worsens and the more my head aches. The same holds true if I do too much physical activity. It's especially hard for me to think quickly, multi-task and do complicated tasks. Many days I feel as though I am "thinking in a fog." My memory is so poor now that if it weren't so scary it would be laughable. I have watched movies with my children and then weeks later not even remember ever hearing about the movie, much less remember seeing it. Following a simple recipe can be daunting as I can't remember what I just read by the time I get to the cupboard for the ingredients.

I am pretty limited even on my relatively "good days"; but, I also have much worse than usual "bad" days when I can do almost nothing at all. These very bad days may occur if I've pushed too much on the day before. They can also occur unpredictably, even if I try and pace myself. On these bad days I can usually do little more than get out of bed (if even that).

I try and do as much as I can every day as it upsets me to have to lie around and do nothing. I push myself as hard as I can but often will "hit the wall" and have to lie down and/or sleep as a severe feeling of malaise will suddenly over take me. This may include nausea, lightheadedness, massive headaches, visual disturbances etc. The hallmark symptoms of CFS.

Writing this document has been over a 6 month long effort on my part. In my profession and in my previous jobs, I was relied on to write exhaustive documents. These documents would be on the order of 50-75 pages and extremely technical and at times go well beyond my education and training. Including the research required, the actual writing of these documents would be on the order of weeks, not months, and would be done while I performed all my other job duties and lived my daily life. In contrast, writing this document has been a hellish event, both from an emotional point of view and in terms of the physical demands it has placed on me. From abnormal eye strain and tiredness from looking at documents and the computer screen, to the almost constant debilitating headaches, to trying to think and write in a "fog" require multiple re-writes to clear up sections that I had written that I did not even understand when I reread them. Having a need to lie down or suffer from nausea, dizziness, lightheadedness and headaches. Knowing that when I am done from a "days work" (~2 hours at most) I will experience night sweats, continued headaches, will no longer be able to mentally process even the simplest task, and knowing that I will feel for the next several days that I have just survived running a marathon or being hit by a truck. My fear is that when I am completely done with all the testing and writing required by this appeal I will have a major "relapse" requiring me to remain bedridden for days and weeks at a time.

ML0131

I still cling to a hope that one day I will get better. Maybe not completely, but well enough to go back to work. I am in constant self-evaluation mode asking myself if I feel any better or if I think there is anything in the job market that I can possibly do. At this time there have been no improvements in my health over the time that MetLife originally approved my long term disability benefits. On many days I can barely take care of my personal needs and I continue to experience severe post-exertional malaise on a daily basis and irregular bouts of balance disturbance, muscle and joint pain, and headaches. Almost on a daily basis I must spend the majority of my waking hours lying down, because if I am up for more that an hour or two at a time I may become confused and unable to concentrate or even converse with ordinary alertness. I cannot conceive of a job that would be possible for me to perform. I am left a person who waits for developments in science to alleviate my symptoms and discover more about this disease. I search the internet as often as possible and keep in contact with others with CFS looking for a treatment and/or strategy that would allow me to once again participate in life.

ML0132

# MetLife Physician's File Reviews

In the file provided by MetLife containing all the requested documentation pertinent to this appeal there is an Independent Physician Consultant (IPC) review which was completed by a Dr. E. Gosline on 12/13/04. In addition there is a total of 2 Physician's File Reviews (PFR) that expresses the opinions of outsourced physicians hired by MetLife intending to review the case file with some "objectivity." The first of these physicians is Dr. Amy Hopkins (PFR completed on 11/5/04) and the second is Dr. D. Dennis Payne (PFR completed on 06/15/06). Following is a separate review of each of these documents.

ML0133

## 11/05/04 *Physician's File Review (PFR) - Dr. Amy Hopkins*[3]:

This file review done by Dr. Amy Hopkins is full of inaccuracies, mis-quotes and misunderstandings. In the first line of the "History" section it references treating physician Dr. Bell as a doctor of pediatrics and no reference to the expertise that Dr. Bell has with CFS (Dr. Bell also happens to be a family physician, not just pediatrics). He is considered one of the foremost experts in the diagnosis of and treatment of CFS as well as mechanisms of the disease (please refer to appendix 10 for a listing of Dr. Bells credentials).

In the body of the "History" section Dr. Hopkins states that "... (Dr. Bell's)... impression was chronic pain/CFS secondary to depression..!" A review of the medical file from Dr. Bell never refers to CFS as secondary. In fact Dr. Bell makes multiple statements which say the exact opposite, that the depression is secondary to the CFS. Later in that same paragraph she states "...worsening of activity restriction and pain related to chronic fatigue was one of the things which was clearly worsening his depression, though this had been debated..." This statement was taken out of context in an attempt to convey that Dr. Bell had debated this conclusion. The actual state from Dr. Bell's letter of 6/23/03 to Dr. Kates was "...worsening his depression although, as you know, this has been a nation-wide debate over the past several years..." Dr. Bell was referring to a nation-wide debate over whether chronic pain increases depression, or if depression had the ability to increase the perception of pain.

Further in the history section Dr. Hopkins states that "Dr. Kates, EE's PCP, felt that this was "entirely a psychosomatic problem". "That EE should not have any pain medication, and that EE needed to confront his problems." This may have been a misunderstanding on Dr. Hopkins part, or a statement taken out of context with the express intent to discredit. This statement was obtained from a letter on 8/11/03 where Dr. Bell had documented a discussion with Dr. Kates. The direct quote is ..."Discussion with Dr. Kates reveals that *he* feels that this is entirely a psychosomatic problem and *he* should not have any pain medication because he needs to confront his problems..." As Dr. Kates is a woman, the italicized "*he*" in that statement refers to me. During a discussion with Dr. Kates, I had mused on the possibility that through mental means alone, perhaps I could deal with the pain (as I have done in the past with my several back surgeries. I have never like having to take medicines, especially pain medications which can cloud judgment), and we discussed the possibility of a referral to a hypnotist (desperate times call for desperate measures). Not performing due diligence and rushing to judgment caused Dr. Hopkins to make this statement appear as though my PCP considered me psychosomatic (which I can assure you, she did not).

Towards the end of the "History" section Dr. Hopkins states that Dr. Bell "...filled out an APS 9/1/04 ...[and] ... checked off that he could not determine if EE was disabled...". In reply to my request to MetLife requesting all documentation pertinent to my case, I was not given a document that had been dated 9/1/04 which could be construed as this "APS" dated 9/1/04. That being the case, I cannot comment on what was or wasn't checked, but I do know that Dr. Bell documented in a letter dated August 30, 2004 (as well as in many other letters, replies and documentation) that "... John Magee ... has had worsening of his symptoms to the degree where he is not able to return to work..." If this "APS" dated 9/1/04 were to be taken in context with the reams of other correspondences from Dr. Bell, it would be obvious that Dr. Bell did (and does) believe me to be totally disabled from my job or any other job or occupation.

---

[3] Please see Appendix 3

During the "Comment" section of the PCR, in discussing the positive testing for orthostatic hypotension Dr. Hopkins glosses over the positive result, "guessing" it could be side effects of unknown medications. I would like to think that objective evidence is not included or excluded based on hypothesizing. She points out that Dr. Bell "... did not document any indication that EE's medications might of caused the orthostatic hypotension..." Dr. Bell did not document any such thing as he (obviously) did not believe that any type of medication was responsible for the hypotension.

Dr. Hopkins also states that Dr. Bell "... feels that EE is disabled due to his self-reported fatigue, but did not provide any objective basis..." This is an absurd oversimplification. Dr. Bell feels I am disabled due to Chronic Fatigue Syndrome, a diseased recognized by the CDC and NIH. Fatigue (which in itself has no known "objective" measure) actually has very little to do with the overall diagnosis.

Dr. Hopkins once again makes the assertion that my PCP suggested that I was (am) psychosomatic, where my PCP clearly did not (as explained earlier). Dr. Hopkins then shows the breadth of her ignorance of CFS when she states that "... [Depression is]... one of the most common causes of "chronic fatigue syndrome." Chronic fatigue syndrome currently has no known cause (again, as defined by the CDC description of CFS). The suggestion that CFS is caused by depression is absurd and not supported by any medical documentation.

While discussing the diagnosis of hypovolumia, Dr. Hopkins mitigates the results of this test with her words "...alleged volume depletion..." The results of the tests performed by Strong Memorial Hospital, following standard protocol are hardly "alleged." The results clearly show a volume deficiency of 46%. Dr. Hopkins goes on by referring to possible dehydration and stating that the therapy offered (saline infusion) could have been better served by larger oral fluid intake. Unfortunately Dr. Hopkins did not perform due diligence once again, for if she did, she would have realized that if the hypovolumia was due to dehydration, I would have been most likely dead due to renal failure. Most dehydration deaths occur at 10-20% fluid loss, yet I manage to inexplicably survive with a 46% fluid loss. Also of note is that in dehydration cases, it is the plasma levels that are low, and the blood count ratios are disturbed. My ratios are within acceptable limits. A common belief now held among many medical professionals is that hypovolumia is most likely the reason that people with CFS need to lay flat for most of the day as laying flat reduces the patient's gravity driven experience of blood pooling in the extremities so that less of it is available to nourish the brain.

On November 10, 2004, Dr Bell had a chance to respond to Dr. Hopkins report stating "...I would disagree with the implication in this letter that there is no physical impairment by the claimant ...[and] ... Mr. Magee is impaired due to Chronic Fatigue Syndrome." Dr. Bell then goes on to suggest that if MetLife would like, he would do more testing that may help to support the diagnosis of CFS. No response was received from MetLife to this offer by Dr. Bell. As the testing suggested does impact the health of the patient, and not knowing whether such testing and results would be acceptable and conclusive of my diagnosis to MetLife, Dr. Bell has been reluctant to schedule such testing.

This is not the first time Metropolitan Life Ins. Co. has used Dr. Hopkins in an attempt to discredit a patient with CFS and/or CFS symptomatology. I refer to "Court discredits Amy Hopkins, M.D. Supposition: May v. Metropolitan Life Ins. Co., C.A. No. 03-5056 (N.D. Cal. Sept. 9, 2004). http://ltdclaims.blogspot.com/2005_06_12_ltdclaims_archive.html."

ML0135

## 12/13/04 *Independent Physicians Consultant (IPC) Review - Dr. E. Gosline*[4]

In this IPC, Dr. Gosline (a psychiatrist) reviewed my file and spoke with my treating psychiatrist. On the first page, during the file History/Summary, Dr. Gosline states that based on his review of my file, my last day of work was 11/26/03. I am not sure where this mistake was made, but it is an error that seems to be perpetuated throughout the documents held by MetLife. My actual last date of work was 12/12/03 (as shown on my final pay stub[5]).

In the "Questions Posed and Answers" section Dr. Gosline says "...that this is a documented chronic fatigue syndrome which ... Dr. David S. Bell ...provided clinical findings information ... The present reviewer defers his review to an IPC whose specialty is more directly related to chronic fatigue syndrome." It is apparent that Dr. Gosline has some knowledge of the condition of CFS and agrees with the diagnosis. As he admits his knowledge is somewhat limited about the disease he defers the review. The question that comes to mind is why was this file not reviewed by an IPC with experience and knowledge of CFS as he suggested?

Dr. Gosline then goes on to quote Dr. Tariot (my treating psychiatrist) saying that "... if ... [my] ...fatigue syndrome would improve ... [my] ... depression would be more manageable..." Dr. Gosline also states that he believes that "... [T]he objective clinical findings do support a severity of impairment that would prevent the EE from performing the duties of any job." These statements clearly prove that both Dr. Tariot and Dr. Gosline agree with the diagnosis of CFS, and Dr. Gosline documented that he finds adequate objective clinical findings to support this diagnosis. As there has been no improvement is my physical condition, I do not know why MetLife has seen fit to terminate my benefits.

---

[4] Please see Appendix 4
[5] Please see Appendix 5 for a copy of my final pay stub

ML0136

## 6/15/06 *Independent Physicians Consultant (IPC) Review - Dr. D. Dennis Payne*[6]

In Dr. Payne's PFR he asserts that (*italics are mine*) "The diagnosis felt in the medical record data to be the disabling problem is chronic fatigue syndrome. *This diagnosis is based entirely upon subjective symptomatology without any objective findings on examination, laboratory testing, imaging data, or other specific objective studies used to evaluate conventional disease.* As a result, the "syndrome" designation is made in that this condition is a constellation of symptoms without any histopathological correlate. With that in mind, there is consistency with the clinical evidence (or lack thereof) with the stated diagnosis." Dr. Payne is correct in the statement that the diagnosis is mostly based on subjective symptoms, but there seems to be an overall assumption that because of a lack of a definitive test for CFS, the disease and symptoms cannot be functionally disabling.

These points were made in a letter that Dr. David Bell sent on 6/15/06[7] in response to Dr. Payne's PFR, and were rejected by Dr. Payne in a subsequent review[8] as Dr. Bell's response still did not offer any "objective" evidence. As Dr. Bell had pointed out, Dr. Payne is not very familiar with the disease Chronic Fatigue Syndrome. The termination letter of 7/20 makes reference that "Dr. Payne stated ... [my] condition is a syndrome, as with a well-defined illness or disease, there must be objective measures to support functional restrictions or limitations before limitations can be placed on as individual." This statement is refuted directly by information available from the Centers for Disease Control (CDC). Easily available on the CDC website for both physicians and non-physicians alike are listings of typical functional impairments of people with CFS. As quoted from the CDC[9] website (again, the *italics* are mine):

"...While symptoms vary from person to person in number, type and severity, all *CFS patients are functionally* impaired to some degree. CDC studies show that CFS can be as disabling as multiple sclerosis, lupus, rheumatoid arthritis, heart disease, end-stage renal disease, chronic obstructive pulmonary disease (COPD) and similar chronic conditions.

CFS often follows a cyclical course, alternating between periods of illness and relative well-being. Some patients experience partial or complete remission of symptoms during the course of the illness, but symptoms often reoccur. This pattern of remission and relapse makes CFS especially hard for patients and their health care professionals to manage. Patients who are in remission may be tempted to overdo activities when they're feeling better, which can exacerbate symptoms and fatigue and cause a relapse. In fact, postexertional malaise is a hallmark of the illness..."

In Dr. Payne's PFR, Dr. Payne refers to the need for "...objective studies [to be] used to evaluate conventional disease." This statement precludes the existence of anything other than what he has defined as a "conventional" disease. In his definition, conventional disease is any disease that science and technology has advanced far enough to provide objective evidence. Under this definition, MS would not have been considered a disease until the advent of the CT or MR scan. Migraine headaches

---

[6] See appendix 6 for a copy of Dr. Paynes PFR
[7] See Appendix 7 for a copy of Dr. Bell's response to Dr. Payne's PFR
[8] See Appendix 8 for a copy of Dr. Payne's response to Dr. Bell's response to Dr. Payne's PFR
[9] See Appendix 9 for a copy of the CDC's website defining CFS

would not be classified as disabling. Since Parkinson's and Alzheimer disease could not be diagnose until after death, as the only clear "objective" evidence is by autopsy, they would not be considered as diseases either. The list goes on and on. As of yet, medical science has not developed tests to measure pain and fatigue.

In addition, Dr. Payne, in his rebuttal of 6/16/06[10] does concede that CFS is generally accepted in the medical community as a diagnosis. At issue here is the "Catch-22" where he has claimed that functional impairment cannot be ascertained without objective evidence and diagnosis, but allows that one could have a functionally impairing disease that cannot be diagnosed with objective evidence. It is also apparent the MetLife itself is aware and concedes that CFS is a valid disease with functional limitations as evidence by MetLife's own CFS functional disability form[11].

One piece of objective evidence that seems curiously ignored during Dr. Payne's PFR is the issue of hypovolumia. This test is objective; and by any means (as I understand it) is quite abnormal. The results of this test (done locally at Strong Memorial Hospital) unequivocally states that my blood volume is at 54% of what it should be for a person of my stature. Whereas there has been little research into the cause of this (other that dehydration or catastrophic blood loss), there is anecdotal information tying this to as a common symptom to CFS.

Another "objective" test ignored by Dr. Payne is that of the orthostatic hypotension, again a typical condition present in many who suffer with Chronic Fatigue Syndrome (per the CDC definition).

Other data not taken into consideration by Dr. Payne is Dr. Bell's consistent use of Krupp Fatigue Severity Scale (KFSS)[12], the SF-36 Short Form Health Status[13] and the Modified Karnofsky Performance Status[14]. Whereas all of these scales are subjective, they are considered the gold standard in an attempt to objectify the subjective. A review of Dr. Bell's notes shows that my responses to these questions were consistent and showed a high level of disability. As I had no knowledge of the purpose of these questionnaires, I had no reason to try and adapt my answers to support disability.

---

[10] See Appendix 8 for a copy of Dr. Payne's response to Dr. Bell's response to Dr. Payne's PFR

[11] See Appendix 10 for a copy of MetLife's own CFS Functional Assessment form

[12] KFSS is a nine-item questionnaire that assesses the effect of fatigue on daily activities. Each item on the scale is scored from 1–7 with the KFSS score calculated by taking the mean of the nine items, a higher score signifying a greater severity of fatigue (Wang B, Gladman DD, Urowitz MB. Fatigue in lupus is not correlated with disease activity. J Rheumatol 1998;25:892–5)

[13] SF-36 is a health status questionnaire designed to assess eight health domains with limitation in physical (dpf) or social function (dsf) due to health problems; role limitation because of physical (dpr) or emotional (dre) problems; bodily pain (dbp); mental health (dmh); vitality (dvt)—a balance of energy vs fatigue; and general health perceptions (dgh). SF-36 has been validated as a measure for perceived health status in SLE (Gladman D, Urowitz M, Fortin P et al. Systemic Lupus International Collaborating Clinics Conference on assessment of lupus flare and Quality of Life measures in SLE. SLICC Group. J Rheumatol 1996;23:1953–5)

[14] The Karnofsky Performance Status (KPS) is a gold standard scale. The Thorne-modified KPS (TKPS) focuses on community-based care and has been shown to be more relevant to palliative care settings than the original KPS. The Australia-modified KPS (AKPS) blends KPS and TKPS to accommodate any setting of care. (from BMC Palliat Care. 2005 Nov 12;4:7.)

ML0138

# MetLife Diary

Following is a review of the "diary" pertaining to my claim #640407128904. This covers the time period of 7/12/04 through 8/10/06. As far as I understand and have been lead to believe by MetLife these are the only notes to date involving communication with anyone by MetLife regarding my claim. As I reviewed the different "diary" entries by MetLife personal I was surprised to see many errors, falsities and (frankly) sloppiness by a company that presumably manages hundreds of thousands of medical and disability claims. From my background as a quality engineer, I would recommend that procedures be changed that keep the claimant abreast of all developments and of all documentation and communication on a real time basis so that errors such as these are not entered into record and used in reviews. Also, when such documentation is sent to claimants it should include a definition key for the terminology and acronyms used. Practices, procedures and terminology seem to be lacking consistency as well as common definition. Examples (though not exhaustive) of these entries below (*my italicized comments follow each entry*):

**"On 09/17/2004 13:57 – For 640407128904**

**...CM CHECKED OTHER CLAIMS EE HAD AND NOTICED THE MEDICAL WAS PUT ON THE WRONG CLAIM..."**
*I had been told that my claim would be denied if my medical files were not sent in. I was told repeatedly by MetLife that they had not been even though my doctor had mailed them. The fact was that the files had been received (with the correct claim number written on them) but "lost" in MetLife. Much anxiety and confusion was had on my part, when in fact it had been MetLife's mistake.*

**"On 09/20/2004 14:07 – For 640407128904**

**...PER NC WALK-UP:**
**WOULD RECOMMEND IPC OR IME OR POSSIBLE FCE TO DETERMINE FUNCTIONALITY.**
**I THINK AN IPC IS A GOOD CHOICE FOR NOW) SOME QUESTIONS THAT MAY WANT TO BE ADDRESSED:**
**HAVE ALTERNATIVE DIAGNOSIES BEEN INVESTIGATED?**
**HAVE UPROVEN TREATMENTS RESULTED IN UNWANTED SIDE EFFECTS?**
**..."**
*These suggestions that came from a MetLife nurse seem to be a good idea. Why was there no follow up on their own questions?*

**"On 10/04/2004 14:53– For 640407128904**

**...FOLLOW UP FOR COPIES OF MEDICAL DOCUMENTATION AND WHEN RECEIVED SEND TO RHEUMATOLOGIST FOR IPC REVIEW...**
**"On 10/07/2004 09:16 – For 640407128904**

**...NC REFERRAL TO IPC DR HOPKINS FOR FILE REVIEW"**

*The first entry suggests forwarding my file to a rheumatologist but it ended up being forwarded to Dr. Amy Hopkins, who is a Doctor of Internal Medicine, not a rheumatologist. Why did MetLife not follow their own advice?*

**"On 10/14/2004 12:04 – For 640407128904**

**OUTGOING CORRESPONDENCE TO PSYCHIATRSIT DR TARIOT**
**... REVIEWING JOHN MAGEE'S ELIGIBILITY FOR SHORT-TERM DISABILITY BENEFITS... PLEASE FORWARD RELEVANT PROGRESS NOTES, TESTING RESULTS, AND CONSULTATION REPORTS IN REGARDS TO MR. MCGEE..."**

*This letter which was sent to Dr. Tariot claims that MetLife is reviewing my case for short-term disability which conceivably influence the data that she choose to submit. Again sloppiness is evident in the spelling of psychiatrist and the confusion in the spelling of my last name. Also, why was this asked for after the file had been sent for an IPC review?*

**"On 10/14/2004 12:15 – For 640407128904**

**...FOLLOW UP FOR RESPONSE FOR MEDICAL REQUEST FOR DR TARIOT AND COUNSELOR CAROLYN CEROME. WILL REVIEW WHEN RECEIVED FOR POSSIBLE REFERRAL TO IPC IF APPROPRIATE...**

**ON 10/14/2004 12:15 – FOR 640407128904**

**...IPC REFERRAL/MEDICAL RCVD FROM UTICA OFFICE PER CM LEAVE REFERRAL WITH SELECTED IPC."**

*Apparently the material sent to Dr. Hopkins on 10/07/2004 did not include the information from all of my health providers? Is it not important for a doctor to receive all relevant information in order to make a diagnosis? Dr. Hopkins makes references to my depression but had no documentation from my providers with regards to diagnoses?*

**"On 11/05/2004 18:19 – For 640407128904**

**OUTGOING CALL TO EE...**
**REACHED HIS VM AT WHICH TIME I LEFT MESSAGE THAT I FAXED A REPORT TO DR BELL AND REQUESTED THE HE F/U WITH DR BELL TO REVIEW REPORT AND RESPOND TO METLIFE BY 11-19-04 IF NOT IN AGREEMENT WITH THE REPORT..."**

*Why is the report not shared directly with the claimant? Ill people (such as people with CFS) have a hard time having to "follow up" with anything. Most days I cannot deal with having to pay bills etc. not including the extra activities required for me to schedule an appointment and make a visit to a doctor who's office is over an hour away, or requesting that a doctor re-forward a report. The idea that a case as serious as long term disability can be trusted to voice mail, and subjected to a proof of a hypothesis by negating the negative is a scary one to someone who relies on LTD to keep his family secure. Also unreasonable is the idea of blindly faxing a letter to a doctor who business may cause him to be out of town for weeks at a time (training, seminars, participating in government committees) and expecting*

*him to respond within a two-week time frame.*

"On 11/05/2004 19:44 – For 640407128904

...DR TARIOT RETURNED QUESTIONAIRE FOR I SENT TO HIM...

On 11/05/2004 19:45 – For 640407128904

...EE WAS INPT FOR 4 WEEKS ... IS... MARRIED WITH 4 KIDS..."

*These two entries were continuations of each other. Dr. Alice Tariot may be annoyed to be called a "him." The report referenced is one that I have no details around as it was not sent to me in the (supposed) full documentation package I requested from MetLife. I am not sure if the mistakes are those of Dr. Tariot or those of MetLife but I was not an inpatient for 4 weeks (4 days) and I am married but I have 5 kids. I am not sure of what portion of this documentation is sent to other physicians for review, but mistakes in listing history may influence a doctor's opinion. Again looking at this from a quality perspective, patients should be sent copies of these "diary" entries on a regular basis so they can scan for mistakes such as this.*

"On 11/18/2004 10:58 – For 640407128904

INCOMING CALL LEFT ON CM'S VOICE MESSAGE SYSTEM FROM ER, LINDA TOME
...EE'S STD MAX DATE WAS 9/17/04 AND LTD BENEFITS SHOULD START ON 9/18/04...

On 11/18/2004 11:27 – For 640407128904
...CM STATED THAT THE CLAIM WAS SET UP CORRECTLY AND THE STD MAX DATE
IN 9/17/04. THIS PARTICULAR CLAIM MODEL IS SET UP UNDER THE KODAK PLAN,
BECAUSE ITT BOUGHT A PORTION OF KODAK AND THE BSD 9/20/04 (MONDAY).
PLAN IS A WORKING MONTH PLAN, PAID FOR MON-FRI"

*This seems to be an ongoing problem. I worked for Kodak, contracted my LTD through Kodak and was covered under Kodak's STD policy. While I was out on STD, my Kodak division was bought out by ITT Industries. I was told that when my STD benefits ended I would still be covered under the Kodak LTD policy but it would be administered by ITT Industries. I am not sure how the dates above where arrived at, my last day of work was 12/12/03. This situation has also left me in flux and handicapped in terms of finding out questions regarding my LTD benefits. Since I am no longer listed at Kodak as an employee (their database shows me transferring to ITT Industries) their HR and benefits won't talk to me (they have refused on the phone, and have not responded to my e-mails). Any questions I call ITT HR with are answered in regards to ITT's LTD and I constantly receive the wrong answers. ITT's knowledge (or lack there of) of this situation has created hardships for me (i.e. ITT canceling my health care benefits at the termination of my LTD, even though the Kodak plan calls for the continuation of benefits for two months after termination of LTD). Until recently, MetLife has instructed me to call ITT and/or Kodak with questions and requests and doesn't understand that neither one of those avenues are trustworthy or open to me (though MetLife's CM did recently e-mail Kodak and I finally received a copy of the Kodak LTD plan).*

"On 12/18/2004 10:58 – For 640407128904

ML0141

**...DOCUMENTATION IS LIMITED FOR CHRONIC FATIGUE SYNDROME BU EE IS FUNCTIONALY IMPAIRED..."**

*This is a line from an entry summarizing Dr. Goline's IPC. No where in his IPC does he claim that documentation is limited. In fact, he says just the opposite saying "...that this is a documented chronic fatigue syndrome which ... Dr. David S. Bell ...provided extensive information..." A quick check of the records shows the volume of information presented for the diagnosis of CFS is much greater than that presented that lead to the opinion that I suffer from major depressive disorder. I also am amazed that MetLife's stance seems to be that functionality (or lack there of) can be determined in a depressive disorder (which is self reported and offers no objective clinical findings) but not in CFS. This is also another case of if I had understood that my LTD was granted only due to my "mental" condition, I would have begun convincing MetLife that the true case of my disability was CFS, and perhaps could have prevented this whole appeal process.*

**"On 07/29/2005 10:51 – For 640407128904**

**... AP TREATING FOR CFS DIFFERS IN OPINION WITH AP TREATING FOR DEPRESSIVE DISORDER ... BOTH ... DISAGREE ON WHETHER THE DEPRESSIVE DISORDER ID THE CAUSE OF THE DISABILITY OR SYMPTOM OF IT."**

*I don't know how to put this other than say it is an outright falsehood. There is nothing in the documentation that states that the opinion of my psychiatrist is anything other than that my depression is resulting from the life changes resulting from having CFS and/or being in pain. On the outside chance MetLife had gotten this information from someplace other than the documentation that was shared with me, I queried my psychiatrist and her response (via e-mail) was:*

"John, My statement says: This patient has fatigue and pain. It is impossible to separate out which of his illnesses (pain vs. CFS) is causing these sx. However the severity of symptoms makes it impossible for him to work.

Another statement says : pt has a chronic debilitating physical illness that impacts mood."

So I think they misquoted me.

Also, do yo know if your Medicare card has an "A" before the numbers??? Thanks, Dr. Tariot"

**"On 02/20/2006 11:15 – For 640407128904**

**... METLIFE CHRONIC FATIGUE SYNDROME INITIAL FUNCTIONAL ASSESSMENT: ... CDC CRITERIA MET: YES ... ASSESSMENT: CHRONIC FATIGUE SYNDROME ..."**

*This entry clearly shows that MetLife is familiar with the diagnosis of CFS (they even have their own functional assessment sheet), and the documentation by the CDC. MetLife's own assessment is that I suffer from CFS.*

**"On 02/21/2006 15:47 – For 640407128904**

**... CM TO SEE IF EE HAS HAD ANY NEUROPSYCH/COGNITIVE TESTING DONE TO**

ML0142

**EVALUATE EES LIMITATIONS...”**

*I was asked this and responded during the call that any cognitive testing I had was done during a study and I did not have the results. If this could have helped my claim, why wasn't I asked to either get the results or have testing done?*

**“On 05/05/2006 12:26 – For 640407128904**

**TO:** LINDA.STOUT@PENSKE.COM

**... ATTACHED IS A COPY OF THE TERMINATION COVER LETTER FOR THOMAS DVORAK ...”**

*This entry is about another claimant and has nothing to do with me. It includes someone else's social security numbers. What processes are in place that prevent the erroneous sharing of protected personal information? If this entry ended up in my "diary" how can I be sure that entries concerning my claim that are supposed to be included in this documentation aren't actually in someone else's file??*

**“On 05/08/2006 08:30 – For 640407128904**

**... MR. BELL ...”**

*No doubt just a typo, but sloppiness which mitigates DOCTOR Bell's credentials.*

**“On 05/25/2006 12:04 – For 640407128904**

**... EE SAID THAT HE RECEIVED A COPY OF A LETTER FROM HIS HCP THAT APPARENTLY IS A RESPONSE TO A LETTER SENT TO HCP REGARDING A PHYSICIAN CONSULT REPORT THAT WAS DEROGATORY IN NATURE....”**

*Again, I don't understand why these reports aren't sent to the claimant also. In the preceding entries it is evident that the denial letter was already drafted and going out for approval because my AP had not responded to MetLife's request in a timely enough fashion (as defined by MetLife). Meanwhile, I knew nothing of this. Shouldn't the claimant be allowed the opportunity to advocate for themselves prior to denial? Also, the entry above was taken by someone other that my CM who was out of the office at the time of the call. The person who took the call had no idea what I was talking about and said my CM would call back later. Following entries said the CM to call back and left a message with a "female at EE's residence to c/b...." This again begs the question of should calls such as these can be trusted to voice mail or to a random "female" who answers. My memory is poor, but I don't believe that I ever received this message. I also see that I did not return the call so I believe that one of my children or their friends answered the phone and never gave me the message. Also, my message was entered pretty clearly in the "diary" and I believe is clear on the fact that I was looking for the most recent IPC sent to Dr. Bell. Following up by sending me this in response to me call should not have be difficult.*

**“On 06/21/2006 10:11 – For 640407128904**

**CLAIM COMMENT**
**PER PLAN EE IS ELIGIBLE TO 2 ADDITIONAL MONTHS OF BENEFITS WHEN**

ML0143

**TERMINATED FOR MEDICAL DOES NOT SUPPORT. EE FOLLOW KODAK PLAN BOOKLET"**

*The only issue here is that this information was not shared with myself and perhaps not with ITT as ITT did cancel my benefits at termination of my LTD. It was re-instated but only after repeated calls from myself and after I had incurred health care costs. It is true that I was able then to resubmit the bills, but for someone suffering with CFS, it turned out to be a major undertaking and hardship.*

**"On 07/20/2006 10:32 – For 640407128904**

...

**FROM UNIT MANAGER REGARDING TERMINATION LETTER....**
**... PLEASE USE THE ITT PLAN WORDING ..."**

*Again, I am covered under the Kodak plan. This again adds to the confusion begging the question is anybody really sure about what they are doing. I realize that I am probably somewhat a unique case, but plans and procedures should ensure that the claimant is not disadvantaged because of in-house confusion as to what the policy is.*

**"On 07/25/2006 07:27 – For 640407128904**

**INCOMING EMAIL – EMPLOYER**
**REGARDING SSDIB AWARD LETTER**
**... PETER ... WOULD YOU BE ABLE TO SEND ME A COPY OF HIS AWARD LETTER? WE HAD ASKED FOR IT FROM THE EMPLOYEE, HOWEVER, HAVE NEVER RECEIVED..."**

*Just to set the record straight, as far as I know ITT never requested a copy of this from me. When I queried Linda Tome (the author of the above note) she said that perhaps she was mistaken and said she would contact MetLife via e-mail and have it corrected. I take it that never happened.*

ML0144

# Summary

The intent behind purchasing LTD insurance is so that if one becomes to sick to work, the insurance will help pick up the slack. Due to 5 previous back surgeries, I paid monthly to protect my family in case my back ever became too injured for me to be able to work.

The Long Term Disability Plan that I had contracted to (through Eastman Kodak, when I first became ill,) does not specify the need for "objective" evidence of a disease to establish functional impairment. It stipulates "that a claimant is considered disabled for the purpose of the Plan if the claimant is totally and continuously unable to engage in any substantial gainful work (except Company approved rehabilitative employment) for which the claimant is or becomes, reasonable qualified by education, training or experience (page 194 – Kodak Employee Handbook)."

In addition, in the Long-Term disability section of the <u>You and Kodak</u> benefits handbook (which was in effect at the time that I applied for LTD) states in the introduction that:

"The **Kodak Long-Term Disability Plan (LTD Plan)** is designed to provide eligible employees with continuing income when an extended disability prevents them from working... The LTD Plan covers both temporary and permanent disabilities..."

It also defines the use of the term disabled as:

> "**Disabled:** You are Disabled when your condition meets all of the following four criteria:
> - As a result of your condition you are totally and continually unable to engage in gainful work, with or with out reasonable accommodation...
> - You are under the care of a licensed physician who is treating your condition;
> - Your condition has lasted 26 weeks or more...; and,
> - Your condition did not result from participation in an insurrection, rebellion, or riot, nor did it result from commission of a crime for which you are convicted..."

Objective evidence notwithstanding, I currently *am* "totally and continuously unable to engage in any substantial gainful work," as has been well documented by my Doctors and therapist. I am no longer able to work (as much as I might want to), and whether this is turns out to be a "temporary... [or]... permanent disabilit[y]..." I meet all four of the criteria stipulated for being "disabled."

I am currently receiving Social Security (SS) Disability Benefits. SS felt that the clinical records were clear that I am indeed suffering from Chronic Fatigue Syndrome as defined by the CDC (as well as the National Institute of Health, and the World Health Organization for that matter). Dr. David Bell is one of the foremost experts in the field of CFS (previous chair of the Health and Human Services Advisory Committed on CFS which reports to the Department of Health ) and taken very seriously in the

ML0145

medical community and he unequivocally states many times in his documentation regarding my disability that his informed diagnosis is that of Chronic Fatigue Syndrome.

A brief check on the internet will lead anyone not only to information dedicated to the description and diagnosis of CFS but to archives of scientific literature in respectable publications filled with research findings consistent with my doctors' explanations. In fact, numbered among the most prominent publications are papers and books authored by my doctors.

My history should demonstrate that I believe that my working is foremost in my priorities. No one wants to explain to people (especially their children) why they can not work. My course with this disease follows the typical course for CFS shared by many others afflicted by the same condition (and as described on the CDC website). I have allowed myself to be poked and prodded by numerous tests in order to exclude any other possible condition or disease and the conclusion arrived at by numerous doctors is that I suffer from Chronic Fatigue Syndrome. I have also put myself through many tests and treatments outside the medical mainstream at both a financial and physical cost to me. As is typical with many people who suffer any chronic debilitating disease, I went through bouts of sadness in trying to adjust to the major life changes that have resulted to my impairments (which I doubt that I will ever accept totally).

My symptoms are such that there is no way that I could presently work. My ailments are typical of those listed on the CDC web site and would keep me from being able to hold a job. I cannot concentrate, my memory is poor, my head often aches, my body is in constant pain, I have little stamina, I suffer from postexertional malaise, my thinking is slow and many days I have to spend either sleeping or resting. Writing this document has been an unnecessary strain on my health and condition.

There have been three (3) reviews performed on my file by doctors hired by MetLife to evaluate my claim. They are Doctors Hopkins, Gosline and Payne. The review of Dr. Hopkins cannot be taken seriously as it was done without all of the information (e.g. files from all the health care workers) and it is full of suppositions, mis-truths, mis-quotes and errors. Her entire review shows her lack of knowledge around CFS and also shows a propensity to not base my case on the facts, but try to deny this case through any means she can. Not once does she take into serious consideration my own doctors opinion.

Dr. Gosline seems to be the only doctor contacted my MetLife with any knowledge of CFS and it appears his opinion was totally ignored with regards to the diagnosis of Chronic Fatigue Syndrome and having a physician with expertise in CFS review the file. He also clearly documents that my "depression" is secondary to my organic illness.

Dr. Payne basic argument is that CFS cannot be functionally impairing since it cannot be diagnosed by purely object means. This has to be seen as an overtly simple litmus test for functional impairment and questions his impartiality to my file. The CDC clearly states that CFS is a disease and all people with CFS are functionally impaired to some extent. This does leave the determination of the impairment to rely on subjective symptoms as well as the reliability and consensus of the patient and his/her history.

The diary keep by MetLife with regards to my claim is full of errors and falsities. How can a running document which is used in such a important determination as the survivability of a family be so

ML0146

0703080003416  0038

ML0147

sloppy? The method of communication seems haphazard and appears to fall short in favor of MetLife. Again, from a quality perspective, MetLife and its procedures fall short of accepted industry practice. There are suggestions throughout the diary that are good suggestions, but never carried out. There is obviously knowledge of CFS within MetLife as they have other clients on LTD with this affliction. They know of the functional impairment issues as shown by their own "CFS Functional Impairment" worksheet.

The final question to be asked is: Am I or am I not so functionally impaired that I can no longer be employed? It is true that there is no conclusive test at present to diagnosis CFS. Consequently the diagnosis requires elimination of other possible causes and the use of a patient's self-reported symptoms. I can understand a need for checks and balances, and the reluctance to accept "subjective" type evidence as in some cases it could be fabricated by someone not wishing to work and still wanting to get paid. That is not the case with me. I am a person of integrity. One reason I excelled at my profession as a Quality Engineer/Manager is that I believe in integrity, honesty and doing what is right at all times. Quality professionals are typically seen as the "police" of industry, making sure things are done by the rules. Such it is in my own life. Even a poor reviewer should be able to see evidence of that integrity and my intent within these pages. Examples such as:

- My work history shows that I was a person who was dedicated to my job and enjoyed what I did
- My documented history with CFS shows that this is something I have been dealing with for almost 12 years. That is a long time to fake symptoms consistently
- Up to the time I had to leave work for health reasons I had sacrificed much and made a valiant (or to quote my therapist "heroic") effort to maintain my job above all else
- My health professionals who all agree that I am an honest person, am not malingering and have tried as well as anyone could to remain employed.

To further document these points I have also asked several people to write supporting documents concerning my integrity, work ethic and overall character. Copies of these statements are attached and include documents written by:

- My wife[15] who knows more than anyone the effects this disease has had on me, my quality of life and my work. She has seen firsthand the devastating consequences of my getting sick and having to stop working
- A co-worker who worked closely with me for several years, Judy Woodard[16]
- Two (2) friends (Luke Miller[17], an editor of a national magazine, and Robert Cerame[18], a successful small business owner) whom I have know since high school who both know my history and my character and
- My wife's niece, Maggie Webb[19] who has grown up spending time with our family and has seen my progression from health to illness fist hand.

---

[15] See appendix 11 for the statement by Renee Magee
[16] See appendix 12 for the statement by Judy Woodard
[17] See appendix 13 for the statement by Luke Miller
[18] See appendix 14 for the statement by Robert Cerame
[19] See appendix 15 for the statement by Maggie Webb

ML0148

A reviewer who is making decisions that affect my (and my family's) life who has never met me or has no real knowledge of me other than the medical records cannot possibly make a decision without taking this history into account. My "subjective" symptoms are real; they have the same weight as any need for objective evidence.

Lastly, if I am not functionally disabled, then why have I had to give up so much in my life that is important to me?

On the surface, it appears as though my case for disability is not much different from ... "[a]nother interesting case ... for disability based on chronic fatigue syndrome is Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3rd Cir. 1997). In this case ... the Court found that the plan administrator acted arbitrarily and capriciously in requiring the claimant to provide objective medical evidence that he was unable to engage in any substantial gainful work. Mitchell's CFS claim was initially denied by Metropolitan Life Insurance Company ("MetLife"), the claims administrator under the Kodak group long-term disability plan, on the grounds that Mitchell had failed to "provide objective medical evidence that his condition made him totally and continuously unable to engage in any substantial gainful work for which he was qualified.... The denial decision was upheld on appeal and thereafter Mitchell brought an ERISA action to challenge the administrator's decision.... [T]he Third Circuit determined that the arbitrary and capricious standard should apply since ... the claim file showed that as of the date of disability, "Mitchell's chronic and unpredictable fatigue and loss of concentration made it impossible for him to sustain regular paid employment.... It further stated: Because the disease, although universally recognized as a severe disability, has no known etiology ... it would defeat the legitimate expectations of participants in the Kodak Plan to require those with CFS to make a showing of such etiology as a condition of eligibility for ...LTD benefits. Thus it was arbitrary and capricious for the administrator to deny Mitchell benefits because of a lack of such clinical evidence of the etiology of his CFS.

ML0149

# APPENDIX 1

MetLife's termination letter of Benefits

D. Dennis Payne, Jr., M.D. – Board Certified Internal Medicine and Board Certified Rheumatology, completed a Physician File Review (PFR). The PFR concluded that the medical information on file no longer supports a severity of impairment that precludes you from performing your job as a program assurance manager. The Physician File Review stated you are capable of performing unrestricted work duties and found there are no restrictions or limitations that are supported in the available medical information on file. The PFR concluded your diagnosis of Chronic Fatigue Syndrome is based entirely upon subjective symptomatology without any objective findings on examination, laboratory testing, imaging data, or other specific objective studies used to evaluate conventional disease.

A copy of the Physician File Review was sent to David S. Bell, M.D. for comment. Dr. Bell responded and stated he did not feel the PFR had an understanding of the diagnosis of Chronic Fatigue Syndrome. Dr. Bell's response was sent to the Dr. Payne for review to determine if Dr. Bell's statement changed his opinion of the PFR. Dr. Payne responded and stated that Dr. Bell's response did not change his opinion because Dr. Bell did not submit any additional clinical evidence to support his opinion. Dr. Payne stated your condition is a syndrome, as with a well-defined illness or disease, there must be objective measures to support functional restrictions or limitations before limitations can be placed on an individual.

Therefore, based on Dr. Payne's file review and the lack of clinical evidence to support an impairment, medical no longer supports the existence of a totally disabling condition preventing you from performing any occupation you are qualified for based on your education, training or experience. Lacking from your file is clinical evidence such as office visit notes and physical exam findings to support an ongoing severity of impairment. Therefore, under the terms of the plan, your long term disability benefits are terminated effective August 31, 2006.

Because your claim was denied in whole or in part, you may appeal this decision by sending a written request for appeal to:

MetLife

Attention: Appeals Unit

PO Box 14592

Lexington, KY  40511-4592

within 180 days after you receive this denial letter.  Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration.  Upon request, and free of charge, MetLife will provide you with a copy of the documents, records, or other information we have that are relevant to your claim.  Additionally, upon request MetLife will identify any medical or vocational expert(s) whose advice was obtained in connection with your claim.  The review of your claim will take into account all

ML0150

information submitted by you, regardless of whether the information was submitted in connection with your initial claim for benefits. Moreover, the review of your claim will be conducted by an individual who was not involved in the initial claim denial, and who is not the subordinate of any individual who made the initial claim denial. The review will not afford any deference to the initial claim denial.

MetLife will evaluate all the information and advise you of our determination of your appeal within 45 days after we receive your written request for appeal. If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing. In the event your appeal is denied in whole or in part, you will have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.

If you wish to obtain a copy of the LTD Plan Document you may call Kodak's Benefit Information office at 1-866-308-4576 or e-mail at ww-hrservices@kodak.com. You will be provided with a copy of the document free of charge.

Sincerely,

Peter Knoth
Case Management Specialist
MetLife Disability
1-800-300-4296 – Phone
1-800-230-9531 – Fax

Enclosure

ML0151

Metropolitan Life Insurance Company

MetLife Disability, PO Box 14592, Lexington KY 40511-4592
Fax: 1-800-230-9531

# MetLife

## MetLife Disability Appeal Request Form

*Important: This form must be returned with a request for an appeal review.*

Claim #: 640407128904
Employee Name: JOHN MAGEE
Employer: ITT CORPORATION

Date: _____
Report #: 303269

### Request for Claim Review

**Instructions:** This form should be submitted with any request for a review of our claim decision. You may use the space below to indicate why you believe our claim determination was incorrect. You may attach additional pages or information, if it is pertinent to your request.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# Appendix 2
### Copies of Performance Appraisals

 *Confidential Information*
*Controlled Distribution*
## EMPLOYEE PERFORMANCE ASSESSMENT

**Appraisal Period: Year 2000**

| Name:<br>JOHN MAGEE | Job Title:<br>PROJECT QUALITY LEADER | Job Code:<br>50470443 | Global ID:<br>50620820 |
|---|---|---|---|

### Section 1: Results Assessment

(Discussion with employee should include timely, specific feedback on actual performance against individual and team commitments, multiple times per year)

● Results Far Exceeded Objectives
○ Met All Objectives; Some Results Exceeded Objectives
○ Results Met All Objectives
○ Results Met Some; Not All Objectives
○ Results Did Not Meet Objectives
○ Absent
○ Development

Section 1 Comments:

John joined C&GS in May from D&AI and has been a welcomed addition to the team. He has shown himself to be very well versed in Quality tools, principles, and application. In just a short time within C&GS, John has generated a great deal of respect – for promptly, reliably accomplishing tasks, for demonstrating a broad range of knowledge, and for applying practical sense to situations. I have been able to turnover operation of the cross-Segment Customer Satisfaction team to John's leadership and receive only compliments on his capabilities. Finally, during 2000, John completed his Black Belt certification, making him one of only 3 certified Black Belts within C&GS.

Some of John's key accomplishments include:
D&AI work:
    Program Quality Lead for the Ansel development team, which included:
- Being the KECP "expert" and administrator
- HSE requirements definition/communication/coordination
- IQ requirements definition/documentation
- Development of the Ansel Quality Plan and the test plan and strategy
- UI definition
- VOC efforts/communication
- Managed and coordinated technical resources (i.e. technician, software group, photo studio, IQ lab, etc.)
- Member of the Ansel cross-functional team. Activities here included leading conflict resolution, encouraging use of the corporate values, encouraging the use of quality tools (and leading by example), as well as acting as both the customer and Corporate advocate.
- Performed competitive analysis on competitors' products/software/services

    Program Quality Lead for the RFS 3600 Scanner project
- Acted as mentor to quality technician
- Ensured that the overall quality, cost and delivery goals were met within the product development

    Created and implemented an overall competitive assessment process for the KPro High-end Digital camera business which included:
- The documentation of all known competitive products and specifications.
- Capital projections and business case for the purchase/rental of competitive products
- Testing and documentation of competitive products (including on-site shoots, in studio testing and UI testing with customers
- Team member on developing a five year product road-map for the high-end camera business

C&GS work:
1. Instructor for Kodak Delivers What Customers Want.
2. Actively participated as a short term Quality Coordinator of the Kodak Earth Imaging Project resulting in a more structured team mindset for the development of a commercial venture.
3. Led the effort around the capturing and utilizing Customer Satisfaction input for the different segments within C&GS. This included:
- Utilizing statistical background to complete the data analysis of the 2nd quarter survey, when the survey house fell short

# Appendix 2 (cont.)

Copies of Performance Appraisals

of their goals
- Led the creation of the 3rd quarter survey process and survey house selection.
- Acted as the main interface to the survey house providing weekly updates of status, review of reports and dissemination of information
- Ran specific data queries and draw conclusions from the data to answer specific segment questions
- Mentored each segment in the preparation of the MBF template, which was used as a corporate communication tool.
- Facilitated the Monthly Customer Satisfaction meetings in support of the C&GS Hoshin goals.
- Maintained and updated the Customer Satisfaction data and results as necessary

4. Member of the C&GS Workout team:
- Attended Workout facilitator training
- Worked with team to outline the Workout process to be used in C&GS

---

### Section 2: Values Assessment

(Discussion with employee should include timely, specific feedback on demonstration of the values, multiple times per year)

● Models All Values
○ Consistently Demonstrates Values
○ Does Not Consistently Demonstrate Values

---

Section 2 Comments:

John is an extremely effective communicator who is able to build teamwork and trust within a group, while insuring that their deliverables and commitments are met. He has developed a very solid reputation as a trust-worthy, reliable team leader and team member with the groups he has interacted with in C&GS.

---

### Signatures:

Written By:

Reviewed By:

Employee*:

* Assessment has been discussed. Employee signature does not signify agreement or disagreement.

---

Employee Comments:

Reviewer Comments:

ML0154

# Appendix 2 (cont.)

Copies of Performance Appraisals

---

## Values Assessment Tool

**Definition of Ratings**
1 - Role Model the values - they excel in the demonstration of the value
2 - Demonstrate the values - they meet expectations of demonstrated values
3 - Does not demonstrate the values - they do not meet expectations

**Instructions**

Generally speaking, if a person is rated a 1 in three or more of the ratings categories, they would be rated as role-modeling the values. If a person is rated a "3" in any of the 6 values assessments, the overall rating would generally be an overall "3" - do not meet expectations.

| Value | Narrative Comments | Rating |
|---|---|---|
| **Respect for Individual Dignity** (Shows respect & concern for people as individuals. Supports & values human differences. Avoids public displays of anger, criticism.) | John is an effective consensus builder. He will take the required time to insure that others thoughts and concerns are heard and that their viewpoints are considered | 2 |
| **Uncompromising Integrity** (Honest, ethical behavior. High degree of personal integrity in dealing w/ others. Levels w/ people. Gives credit when due.) | John applies diligence and logic to work he performs. His candor and insights are appreciated and add value to those around him. | 1 |
| **Trust** (Seeks support/assistance from others. Shares info freely. Keeps promises. Stands by others when they take risks. Trusts others to do their job.) | John is a team player who has build the trust of the team who is around him. | 2 |
| **Credibility** (Takes personal responsibility for actions. Admits mistakes. Makes realistic commitments & delivers on them.) | John does what it takes to deliver upon his commitments. He has been known to work late on a Friday night analyzing data that a vendor that he inherited had improperly analyzed – all to be sure to meet a commitment. | 1 |
| **Continuous Improvement** (Seeks to learn, improve, demonstrate new capabilities. Accepts constructive feedback. Seeks to improve business success ) | In addition to his Black Belt, John continually looks for opportunities to grow, develop, and improve. | 1 |
| **Recognition and Celebration** (Welcomes opportunity to openly celebrate achievements of others and congratulates individuals, teams, employees, suppliers and customers for delivering results that contribute to Kodak Success) | | 2 |
| | **OVERALL RATING:** | 1 |

# Appendix 2 (cont.)
### Copies of Performance Appraisals

Employee Performance Assessment for JOHN MAGEE

| | | Appraisal Period: Year 2001 |
|---|---|---|

**EMPLOYEE PERFORMANCE ASSESSMENT**

*Confidential Information*
*Controlled Distribution*

| Name: | Job Title: | Wage Grade: | Global ID: |
|---|---|---|---|
| JOHN MAGEE | QUALITY ENGINEERING | 43 | 50620820 |

**Section 1: Results Assessment**

(Discussion with employee should include timely, specific feedback on actual performance against individual and team commitments, multiple times per year)

- ● Results Far Exceeded Objectives
- ○ Met All Objectives; Some Results Exceeded Objectives
- ○ Results Met All Objectives
- ○ Results Met Some; Not All Objectives
- ○ Results Did Not Meet Objectives
- ○ Absent
- ○ Development

Section 1 Comments:

John has been actively involved in driving improved Customer Satisfaction for C&GS in 2001 — both through hands-on education of key market segment contacts and through customer feedback analysis and then development and implementation support of MBF-based improvement plans. The net result of these efforts has been C&GS achieving 'world class' Customer Satisfaction scores of 90% in 2001.

While John's contributions to improved Customer Satisfaction were significant, this is only a part of his total 2001 contributions. His depth of Quality knowledge and pragmatic approach were leveraged successfully in several areas throughout 2001. As captured by the feedback of one evaluator, "His extensive background in quality allows him to perform management by fact and identify root causes to problems. He is also good at facilitating a group activity to help the group with the MBF/root cause process. He keeps his meetings flowing." In addition to driving C&GS to the premier level of customer satisfaction performance in the corporation, John's accomplishments in 2001 included:

- Establishing a global Perfect Order Fulfillment (POF) metric, process to track, and baselining global performance
- Working with the Aerial segment to enhance their Customer Relationship Management database and processes
- Working with Corporate Quality and Business Research around implementation of a revised Customer Satisfaction metric
- Leading the majority of C&GS' WorkOut teams
- Helping to shaping the development our thinking and planning around the ISO:9001-2000 standard
- Proactively taking a leadership role within the Quality group as a facilitator and catalyst to drive improved working relationships and results within the Quality core group
- Active participation in the Quality team Performance Matrix.
- Facilitation of Hoshin gap closure teams

John is highly respected by the people he works with, as demonstrated by the following quotes:
"John is a great asset to your quality team and a great ... team player. He is dependable, delivers on what he says, when he says, and has good people skills."
"I have enjoyed my dealings with John Magee. I worked with John extensively on Customer Satisfaction surveys and subsequent MBF plans. He is an excellent moderator. My business segment has even used John as a moderator to discuss improvement opportunities."
"John uses 'common sense' when making decisions and plans. He uses a 'what makes the most sense' approach.:

ML0156

# Appendix 2 (cont.)

## Copies of Performance Appraisals

Employee Performance Assessment for JOHN MAGEE

---

**Values Assessment Tool**

**Definition of Ratings:**

1 - Models all values - they excel in the demonstration of the value
2 - Consistently demonstrates values - they meet expectations of demonstrated values
3 - Does not consistently demonstrate values - they do not meet expectations

**Instructions:**

Generally speaking, if a person is rated a 1 in three or more of the ratings categories, they would be rated as role-modeling the values.  If a person is rated a "3" in any of the 6 values assessments, the overall rating would generally be an overall "3" - do not meet expectations.

---

| Value | Narrative Comments | Rating |
|---|---|---|
| **Respect for Individual Dignity** (Shows respect & concern for people as individuals. Supports & values human differences. Avoids public displays of anger, criticism.) | John has built a strong relationship with both internal customers and team members. He is able to nudge others in a positive, proactive manner. He has struggled with concerns and lack of buy-in to senior management decisions and directions during 2001. | 2 |
| **Uncompromising Integrity** (Honest, ethical behavior. High degree of personal integrity in dealing w/ others. Levels w/ people. Gives credit when due.) | Comment from evaluator: "John always does what he says he's going to do. He also freely admits to mistakes when he makes one  -- although it is rare that he makes a mistake." | 1 |
| **Trust** (Seeks support/assistance from others. Shares info freely. Keeps promises. Stands by others when they take risks. Trusts others to do their job.) | John is a highly trusted both by the internal clients he supports and by the members of the Quality COE. | 1 |
| **Credibility** (Takes personal responsibility for actions. Admits mistakes. Makes realistic commitments & delivers on them.) | John is solid in this area. | 2 |
| **Continuous Improvement** (Seeks to learn, improve, demonstrate new capabilities. Accepts constructive feedback. Seeks to improve business success.) | John is always looking for how to do things better and more efficiently. | 2 |
| **Recognition and Celebration** (Welcomes opportunity to openly celebrate achievements of others and congratulates individuals, teams, employees, suppliers and customers for delivering results that contribute to Kodak Success.) | Comment from evaluator: "John is very good about giving praise to others. ... he shouts out praise and whispers improvement opportunities." | 2 |

3

ML0157

# Appendix 2 (cont.)

Copies of Performance Appraisals

PA 2003 - Supervisor2002\By Last Name

---

**Confidential
Information
Controlled
Distribution**

## EMPLOYEE PERFORMANCE ASSESSMENT

**Appraisal Period: Year 2002**

| Name:<br>John Magee | Position Title:<br>MFG PROCESS SUPV/MGMT | Wage Grade:<br>45 | Global ID:<br>50620820 |
|---|---|---|---|

### Section 1: Results Assessment

(Discussion with employee should include timely, specific feedback on actual performance against individual and team commitments, multiple times per year)

○ Results Far Exceeded Objectives
○ Met All Objectives; Some Results Exceeded Objectives
● Results Met All Objectives
○ Results Met Some; Not All Objectives
○ Results Did Not Meet Objectives
○ Absent
○ Development

Section 1 Comments:

In 2002, John was the Program Assurance Quality Manager for E-270. He managed and completed many efforts and was instrumental in meeting program deliverables and bringing the program successfully through the CDR milestone. John coordinated activities with many areas including Configuration Control, Health & Safety, System Risk, Reliability, PM&P, and Contamination.

John displays great versatility and flexibility as demonstrated by the E-270 work stoppage (and subsequent resumption). He adapted to these program changes quickly, efficiently, and with great dedication often times traveling unexpectedly and working long hours. Because of a change in prime contractor status John had to re-write the entire quality portion of the original statement of work. This task was accomplished thoroughly and completely under very aggressive schedule demands.

In the short time I have known him, I have found John to be conscientious, hard-working, results driven, dedicated, and very experienced in applying quality-engineering principles to Remote Sensing programs.

John has completed all planned PCP objectives.

His accomplishments of 2002 are summarized below:

- He successfully integrated quality throughout the E-270 program. This was accomplished by first defining and understanding program quality needs. Subsequently, he then acted as the primary interface with the prime contractor and program office to coordinate and respond to all quality issues. He also provided coordination of all quality resources from within the Total Quality COE.

- To meet customer deliverables called out in the statement of work, John developed and maintained a quality plan outlining the quality philosophy of the E-270 Group. This plan included linkages to the processes and procedures that currently exist within the C&GS ISO 9000 Quality System, and outlined the applicability and importance of these processes and procedures for the E-270 program. This activity also required John to review program specifications and plans in order to verify compliance to the quality plan. Where needed, John provided corrective action and mentoring to internalize and implement processes consistent with the plan.

17

ML0158

# Appendix 2 (cont.)
## Copies of Performance Appraisals

PA 2003 - Supervisor2002\By Last Name

- As the facilitator of both the Risk Board, and the TRB and CCB, John played an active role in the technical process of the E-270 program. He facilitated the failure process on the program that dealt with a number of sensitive technical issues last year including the TM subsurface damage issue. This issue was resolved in a thorough and professional manner that received praise from the customer for all involved.

- To fulfill contractual requirements and to ensure effective communication with customers, prime contractor, teammates, and subcontractors, unique engineering plans and reports were created and supported by John. These plans included Risk Management, Contamination Control, Reliability and Failure Analysis, FMEA, Reliability Requirements definition, Test and Survivability, System Verification, and Requirements Verification.

- He also wrote and integrated the E-270 Configuration Management plan. This plan also included the maintenance of Product Data documentation and coordination of configuration management activities and resources.

- John also supported Product Material and Engineering activities for the E-270 Program. As PM&E resources were stressed, John acted as the primary point of contact for PM&E activities. This activity required John to write and implement the PM&E plan for the program.

- John also provided HSE support to the E-270 program team to ensure compliance with ISO-14000 standards.

### Section 2: Values Assessment

(Discussion with employee should include timely, specific feedback on demonstration of the values, multiple times per year)

- ○ Models All Values
- ● Consistently Demonstrates Values
- ○ Does Not Consistently Demonstrate Values

Section 2 Comments:

John demonstrates all Kodak values. He is well respected by peers and customers. Some example feedback follows:

1. "John prepared plans in a proactive and complete manner, often taking the initiative upon himself to review the program needs and respond accordingly."
2. "He embraced his role on the program with enthusiasm, and worked to ensure that he was appropriately included in all facets of the program."
3. "I give John very high marks for his work this year. He had a large work-load on the program, due, in part, to the general engineering resource
       shortage, and he responded to the challenge."

In summary John provided solid and significant quality contributions to E-270. He approaches his work with enthusiasm, dedication, and with a sense for results.

A key customer has requested (in a positive sense) that John broaden his perspectives of the E-270 program. This will provide him an increasing role, influence, and insight into ensuring that the entire program is consistently applying the program quality plan.

### Signatures:

Written By:    Alan R. Zoyhofski/410932/EKC on 01/30/2003

Reviewed By:   Frank Koerner/472321/EKC on 02/26/2003

Employee:    _____ Assessment has been discussed. Employee signature does not signify agreement or disagreement.

18

# Appendix 3

Physician's File Review (PFR) - Dr. Amy Hopkins

041109029160

Metropolitan Life Insurance Company

**MetLife®**

MetLife Disability
PO Box 14590
Lexington, KY 40511-4590

November 5, 2004

Dr David S Bell,
77 South Main Street,
Lyndonville, NY 14098

RE: Long Term Disability
Claim #: 640407128904
Group #: 303299
Regarding: John Magee

Dear Dr Bell

This is in reference to John Magee's claim for Long Term Disability Benefits.

Enclosed you will find Independent a Physician File Review report completed by Dr Amy Hopkins,
Board Certified Internal Medicine, Board Certified in Occupational Medicine who has reviewed the
medical documentation in Mr. Magee's long term disability file.

Please review the report from DR. Amy Hopkins and indicate if you agree with the conclusions that
were made. If you do not agree with the conclusions that were made, please respond with your
opinion and explain why you do not agree. Also please provide objective medical documentation to
support your opinion of any functional limitations that would preclude Mr. Magee from performing
any/all job duties at this time.

Please be advised that if we do not receive a response by November19, 2004, we can only assume you
agree with the report conclusions made and we will make a determination on your patient's claim
based on the medical documentation in the file. If you have any questions please feel free to contact
our office.

Your cooperation and early reply will be greatly appreciated.

Yours truly,

*Kathryn Snell*

Kathryn Snell RN,
MetLife Disability
1-800-300-4296 ext. 2348
Fax #: 1-800-230-9531

# Appendix 3 (cont.)

Physician's File Review (PFR) - Dr. Amy Hopkins

041109029421

Physician Consultant Review

| | | | |
|---|---|---|---|
| Reviewer: | Amy Hopkins, MD, MPH, PhD | Date: | 11/5/04 |

| | | | |
|---|---|---|---|
| Claim #: | 640407128904 | DOB: | 12/7/59 |
| Name: | John Magee | DDC: | 11/27/03 |
| Ref. Source: | Kathryn Snell | Own Occ/Any Occ: | any |
| Occupation: | program assurance mgr | Work Level: | n/a |

Diagnosis:   chronic fatigue syndrome (CFS), depression
Issue(s):   impairment

History

Dr. Bell (pediatrics) evaluated EE on 9/18/00 for possible CFS. EE reported the onset of restless legs, lower extremity achiness, paresthesias, and fatigue in 4/95, w/ gradual worsening. EE reported depression which started six months after his sx which he felt was separate from his sx. The dx of CFS was made within the past year. EE reported that his depression had resolved. EE was able to work, but had almost no activity outside of work. EE reported bad days about 4 times per month. EE's worst sx were headaches, fatigue, and body pain. EE was on Celebrex and Celexa. EE had glaucoma. EE had several back surgeries. EE reported recurrent sore throats at least three times per month. EE reported eye pain and light sensitivity which his eye physician said was not due to the glaucoma. EE reported nausea and light-headedness with certain odors. EE reported abdominal discomfort and nausea. EE reported very severe muscle pain, along w/ weakness, stiffness, and recurrent backache. EE had a muscle biopsy. EE reported joint pain, morning stiffness, and daily headaches. EE reported prominent cognitive sx. EE reported balance disturbance. EE reported unrefreshing sleep. EE reported night sweats. EE had several consultations by neurologists without specific diagnosis. An MRI of the spine was said to be WNL. Labwork was unremarkable. On exam, EE was in no acute distress, had no cognitive dysfunction, and did not appear depression. EE was obese. There was no neuropathy. Muscle strength was WNL. Romberg was WNL. EE had difficulty w/ tandem stance, but was able to maintain it. His impression was restless leg syndrome, glaucoma s/p back surgery, shellfish allergy, and chronic fatigue syndrome. His OVN of 5/1/03 stated that EE reported worsening, feeling very sore, and being unable to work. EE appeared depressed. The exam was otherwise WNL. He started EE on Percocet and nortriptyline. His OVN of 5/22/03 stated that EE's insomnia was better. EE was using about three Percocet per week. On exam, EE "looks OK". He increased the nortriptyline. His OVN of 6/18/03 stated that EE reported feeling very ill. EE was hospitalized for a suicide attempt. He stated that EE had "orthostatic hypotension by rheumatologist". The exam was WNL. He stopped the nortriptyline. His impression was chronic pain/CFS secondary to depression. He wrote a letter 6/23/03 which stated that the worsening of activity restriction and pain related to chronic fatigue was one of the things which was clearly worsening his depression, though this had been debated. EE had not had any response to medications. He mentioned a "circulating blood volume test" and that he was going to treat EE w/ "volume expansion". He felt that EE was unable to work. His OVN of 7/7/03 stated that EE had abnormal orthostatic testing. He stated that an echocardiogram showed borderline left ventricular hypertrophy. His OVN of 8/11/03 stated that EE's activity had improved slightly

~0197042
Page 1 of 3       *Independent Physician Consultant Review for MetLife Disability*

# Appendix 3 (cont.)

Physician's File Review (PFR) - Dr. Amy Hopkins

041109029421

after intravenous fluids and return to work.  Another OVN dated 8/11/03 stated that EE had a psychotherapist who felt that EE needed increased pain medications because his pain was "clearly out of control".  Dr. Kates, EE's PCP, felt that this was "entirely a psychosomatic problem", that EE should not have any pain medication, and that EE needed to confront his problems.  EE continued to report severe pain.  EE was still extremely depressed.  He started EE on clonazepam.  A telephone note stated that EE had developed phlebitis, which appears to have been related to his PICC line in place to deliver IV saline.  His OVN of 10/24/03 stated that EE reported worse pain.  The exam was WNL.  The OVN of 12/12/03 stated that EE had severe depression.  The OVN of 1/26/04 stated that EE had not worked since the last visit.  EE reported that he was unable to get out of bed.  EE was depressed and was observed to walk w/ difficulty.  He wrote a letter 2/2/04 which stated that EE reported being confined to bed for many days at a time.  He felt that EE's depression was secondary to his medical condition.  His OVN of 2/25/04 stated that EE was overall about the same.  EE was fired from work.  His PICC line was out.  The exam was WNL.  He wrote a letter 3/1/04 which stated that EE reported problems w/ cognitive function.  EE reported marked activity limitation, severe fatigue, exhaustion, post-exertional malaise, muscle pain, joint pain, unrefreshing sleep, and headache.  EE continued to be depressed, which he felt was secondary to his "biologic illness".  He felt that EE was TD w/ a poor prognosis for recovery.  He wrote a letter 3/12/04 which stated that EE had no primary psychiatric disturbance and no hint of malingering, hypochondriasis, or falsification of data.  His OVN of 5/18/04 stated that EE had poor activity and post-exertional malaise.  EE had no significant benefit on IV fluids.  His OVN of 7/13/04 stated that EE's depression was about the same.  EE was taking Vicodin daily.  The exam was WNL.  His OVN of 8/31/04 stated that EE was taking "transfer factor" for one month.  The exam was WNL.  He filled out an APS 9/1/04 which gave a list of physical restrictions.  He checked off that he could not determine if EE was disabled from his own or any occupation.

Orthostatic testing on 7/1/03 was positive once.  Orthostatic testing on another undated sheet was negative.

Comment

The claimant went OOW due to "chronic fatigue syndrome", a collection of sx with no known pathophysiological basis.  All physical exams have been WNL other than for obesity and orthostatic hypotension on one occasion.  Dr. Bell did not document any indication that EE's medications might have caused the orthostatic hypotension, a common side-effect.  EE did not document any ongoing sx of orthostatic hypotension.  No orthostatic hypotension was documented past 7/1/03, so no ongoing impairment due to this was documented.  Dr. Bell feels that EE is disabled due to his self-reported fatigue, but did not provide any objective basis for his opinion.  EE's PCP apparently felt that EE's condition was psychosomatic, so this possibility was raised.  EE has severe depression and attempted suicide, but Dr. Bell feels that this is secondary to EE's "biologic illness", even though no actual physically-based disease process was identified.  It has been well-documented in the literature that many people with depression are unaware of their depression or deny it, so EE's denying he was depressed prior to the onset of his physical sx does not necessarily mean that he was not actually depressed, one of the most common causes of "chronic fatigue syndrome".  EE also identified sleep disturbances.  Lack of sleep can certainly cause most or all of EE's sx, yet there was no evidence in this file that he had ever been referred for a sleep evaluation.

–0197042
Page 2 of 3        *Independent Physician Consultant Review for MetLife Disability*

ML0162

# Appendix 3 (cont.)

Physician's File Review (PFR) - Dr. Amy Hopkins

041109029421

including polysomnogram, which might have identified a treatable cause for EE's fatigue. Dr. Bell treated EE w/ IV fluid for alleged volume depletion, but this is not a widely accepted diagnosis nor treatment. No barrier to EE's ability to take in fluids by mouth was documented, so he could have accomplished the same thing by drinking more water as by having IV fluids administered, which opened him up to potential complications, such as the phlebitis he reportedly had. The administration of IV fluids will also just generally result in higher urinary output unless an individual is rapidly losing fluids to the point where they cannot be replaced by mouth, such as in hemorrhaging, severe vomiting, or severe diarrhea. EE reports severe pain, but there was no physiological basis for his pain identified. Despite the lack of any objective sources for EE's pain by examinations and diagnostic testing, he was started on narcotics and now takes them chronically, which may lead to iatrogenic disease. EE reports cognitive problems, but no cognitive dysfunction was objectively documented in this file.

In summary, EE is OOW due to a variety of self-reported sx with no objective support by examinations or diagnostic test results. This file does not objectively support the presence of any condition of a nature or severity to prevent EE from performing the material duties of his own or any occupation on a full-time basis, without restrictions or limitations. I cannot comment on whether or not there is any significant psychiatric impairment.

<u>Recommendations</u>

No physical impairment was objectively documented which would preclude EE from RTW, FT, own or any occupation, no restrictions or limitations.

*Amy Hopkins, MD, MPH, PhD*

Amy Hopkins, MD, MPH, PhD
Board Certified in Internal Medicine
Board Certified in Occupational Medicine
Fellow of the American College of Occupational & Environmental Medicine

ML0163

# Appendix 4

Independent Physicians Consultant (IPC) Review - Dr. E. Gosline

04122101459

MED / IPC RPT

## PHYSICIAN CONSULTANT REVIEW

**DATE OF REVIEW:** December 13, 2004

**CLAIMANT NAME:** MAGEE, JOHN

**CLAIM NUMBER:** 640407128904

**EMPLOYER:** ITT Industry

**EMPLOYER GROUP ID NUMBER:** 303299

**CLAIMANT SS#:** 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

**DOB:** 12/07/59 (45Y)

**REFERRAL SOURCE:** Kathryn Snell, Nurse Coordinator, Utica office

**Reason for Referral:** This 45-year-old Program Assurance Manager is an active case with long-term disability and is being reviewed for his disability in relationship to any and all occupations. He is under the care of a Dr. Alice Tariot and a telephone conference has been requested and occurred on 12/09/04.

**Diagnoses of Record:** Chronic fatigue syndrome (CFS) and major depressive disorder recurrent with suicidal ideation, but no suicidal plan. There is no additional diagnosis offered under DSM-IV, but we do have office notes and information provided by a Dr. David S. Bell whose specialty is chronic fatigue syndrome and who is treating for this condition, and who has also provided additional information.

**Summary of Activity/Documents Reviewed:** All information provided through the A.C.S., including ongoing office notes from Dr. Tariot, including a Mini-Mental Status Examination and office notes up to and including October 27, 2004 and a letter of February 5, 2004 which is a summary of the treatment. There are several letters and progress notes, as well as examinations by David Bell and a considerable number of laboratory tests provided which confirms the presence of a chronic fatigue syndrome dating back as far as the year 2000.

**Telephone Calls:** A telephone conference was requested and was accomplished with Dr. Alice Tariot.

**File History/Summary:** EE is a 45-year-old male whose last day of work is 11/26/03, and who has a diagnosis of chronic fatigue syndrome, as well as a major depressive disorder. Primary doctor is Dr. Bell for chronic fatigue and EE is being treated by Dr. Alice Tariot for the diagnosis of depression. He has subjective complaints of pain and exhaustion which first appeared in 1995. Current symptoms have worsened to where he

*Independent Physician Consultant Review For MetLife Disability*

ML0164

# Appendix 4 (cont.)

Independent Physicians Consultant (IPC) Review - Dr. E. Gosline

041221C14593

MED / IPC RPT

## PHYSICIAN CONSULTANT REVIEW

December 13, 2004
MAGEE, JOHN
Claim Number: 640407128904
Page 2

is not able to return to work as he feels ill and activity is restricted. Medications include Wellbutrin, Lexapro, Klonopin, and additional medications for pain and for CFS. Please review file for depression and provide an opinion as to the severity of his symptoms and diagnosis.

**Questions Posed and Answers:**

A. Q: Based on your review of the medical documentation on file and a phone call with Dr. Tariot, provide your opinion of the objective clinical findings which support a severity of impairment at this time. Are the symptoms and impairments substantiated by objective clinical findings?

B. Q: How consistent with the clinical evidence presented is the stated diagnosis if applicable under Axis I and DSM-IV?

C. Q: Do the symptoms listed correlate with those usually seen in this condition

D. Q: Provide any further medical recommendations.

Question A: The information provided from the record does indicate that this is a documented chronic fatigue syndrome which is currently under treatment by a Dr. David S. Bell who has provided extensive information establishing this condition. The present reviewer defers his review to an IPC whose specialty is more directly related to chronic fatigue syndrome. The psychiatric aspects of the case as discussed with Dr. Tariot and as verified in her descriptions in her office notes would indicate that this is the primary condition and his psychiatric condition is characterized by a partial compliance with medication. There are several references to depression, suicidal ideation, angry outbursts towards members of the family, particularly a son, and suicidal ideation related to his feelings that he is a nonproductive member of society and accordingly not a worthwhile person. There is considerable weeping, guilt, and self-reported information related to his chronic fatigue syndrome which Dr. Tariot considers as part of his depressive syndrome. In her opinion the depressive elements are of a severity that would prevent him from performing the duties of his own job or any occupation at the present time. She also is of the opinion that if his fatigue syndrome would improve his depression it would be more manageable. For this reason the present reviewer is of the opinion that the objective clinical findings do support a severity of impairment that would prevent the EE from performing the duties of any job. The impairments are substantiated by objective clinical findings, as well as self-reported information. There are evidences that there are contacts

*Independent Physician Consultant Review For MetLife Disability*

# Appendix 4 (cont.)

Independent Physicians Consultant (IPC) Review - Dr. E. Gosline

04122161459

MED / IPC RPT

## PHYSICIAN CONSULTANT REVIEW

December 13, 2004
MAGEE, JOHN
Claim Number: 640407128904
Page 3

with the wife and with the social work therapist on an ongoing basis so that appropriate and adequate treatment is being provided.

Question B:  There is consistent compelling evidence that there is a DSM-IV diagnosis of major depressive disorder related to a chronic fatigue syndrome that would prevent the EE from performing the duties of his own job.

Question C:  Yes

Question D:  The present information does substantiate an ongoing condition limiting the EE's capacity to return to some form of employment at the present time.  It is the present reviewer's opinion that the condition needs ongoing review, possibly on a yearly or half-yearly basis.

ERNEST GOSLINE, M.D., F.A.P.A. (DL)
Board Certified Psychiatrist

EG/JT

ML0166

# Appendix 5

Copy of my final pay stub

| EASTMAN KODAK COMPANY • ROCHESTER, N.Y. 14650 | | | STATEMENT OF EARNINGS AND DEDUCTIONS | | | | |
|---|---|---|---|---|---|---|---|
| EARNINGS | HOURS | AMOUNT | | | | | TAX PERIOD END DATE 12/14/03 |
| REGULAR | 32.0 | 1324.93 | DEDUCTION | AMOUNT | DEDUCTION | AMOUNT | YEAR-TO-DATE |
| SICKNESS | 48.0 | 1987.39 | FICA | -190.77 | | | FICA GROSS 65503.58 |
| | | | FICAMD | -44.61 | | | FICAMD GROSS 65503.58 |
| | | | FED TX | -202.09 | | | FED GROSS 63175.67 |
| | | | ST TAX | -140.76 | | | SIP 2327.71 |
| | | | METDLI | -4.62 | | | FICA TAX 5301.22 |
| | | | METOPT | -23.72 | | | FICAMD TAX 1239.80 |
| | | | SIP LN | -186.34 | | | FED TAX 7296.54 |
| | | | UN WAY | -30.00 | | | STATE TAX 4208.36 |
| GROSS PAY | 80.0 | 3312.32 | | | | | UN WAY 780.00 |
| LIFE-E | | 1.56 | | | | | |
| ADI | | -3.96 | | | | | |
| HEALTH | | -107.54 | | | | | |
| DENTAL | | -21.44 | | | | | |
| LTD | | -5.92 | | | | | |
| HCRA | | -100.00 | | | | | |
| SIP 5.00% | | -165.62 | | | | | |
| | | | | NET PAY | 2088.49 | | FED 09 M    STATE 09 M |
| W2 FED GROSS | | 2911.40 | This is the last pay for tax year 2003 Next paydate is Fri 1/2/04 | | | | |

---

REMOVE DOCUMENT ALONG THIS PERFORATION

**EASTMAN KODAK COMPANY**
ROCHESTER, NEW YORK 14650-1129

PAYROLL DEPOSIT/DEDUCTION RECORD
**INFORMATION PURPOSES ONLY**
NON-NEGOTIABLE

MONTH DAY YEAR
12/18/03

NET AMOUNT DEPOSITED AT                    ACCOUNT NUMBER

HSBC BANK                              545009219          C          003775

JOHN C MAGEE
71 ONTARIO ST
HONEOYE FALLS    NY    14472-1123

**THIS IS NOT A CHECK**

FOR ASSISTANCE PLEASE CONTACT PAYROLL DEPARTMENT VIA EMAIL AT US-PAYROLL (LOTUS NOTES) OR US-PAYROLL@KODAK.COM (INTERNET)

# Appendix 6

Independent Physicians Consultant (IPC) Review - Dr. D. Dennis Payne

05/03/2024 WED 13:56  FAX 815 599 9432 KRR ALLID PHYSICIANS ---  NETLIFE DT 668          @002/005

**060503F07612**



*Utc Physicians*,
Ltd.

*A Subsidiary of*
*NIR*

*Providers of*
*Evidence-Based*
*Medical Reports*

May 3, 2006

Ms. Michele McCann
Metlife Insurance
5950 Airport Road
Omkeny, NY 13424

| | |
|---|---|
| RE: | John Magee |
| CLAIM #: | 640407128904 |
| SS #: | 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 |
| NMR #: | D56537.01 |
| JOB: | Program Assurance Manager |
| DOB: | 12/07/59 |
| EMPLOYER: | ITT Industries |
| DIS. DATE: | 11/27/03 |
| REF. DATE: | 04/27/06 |
| DIAG: | CFS, PTSD/Depression |
| VENDOR TX: | 364041877 |

Dear Ms. McCann,

Thank you for referring this file for review to determine Mr. Magee's level of functionality. Specific issues will be addressed at the end of the report.

**RECORDS PROVIDED FOR REVIEW:**

| | | | |
|---|---|---|---|
| PROG NOTES | David S. Bell, M.D. | 09/18/00-02/06/06 | 1-137 |
| PROG NOTES | Alice M. Turiot, M.D. | 02/05/04-10/14/04 | 138-143 |
| PROG NOTE | Carolyn M. Cerane, LCSW | 03/19/05-12/12/05 | 144 |
| PROG NOTES | ? | ? | 145-146 |
| FILE REVIEW | Amy Hopkins, M.D. | 11/05/04 | 147-149 |
| FILE REVIEW | Ernest Cerdins, M.D. | 12/13/04 | 150-152 |
| LAB | | 09/28/00-06/29/05 | 153-168 |
| OTHER TESTS | | 09/29/00 | 169 |
| JOB | | | 170-172 |
| MISC. | | 07/13/04-02/13/06 | 173-177 |

*6770 Mill Road*
*Rockford, Illinois 61105*

*Phone  315-890-3189*
*Fax  315-599-5477*

*E-Mail*
*info@utcphysicians.com*

*Visit our website*
*www.nmrca.com*



**RHEUMATOLOGY ASSESSMENT:**  A thorough review of the submitted medical information has been completed.

- 4 -

ML0168

# Appendix 6 (cont.)
Independent Physicians Consultant (IPC) Review - Dr. D. Dennis Payne

05/03/2006 WED 10:56    FAX 815 399 5637 MMR SILVER PHYSICIANS ---- NORTHMW BY A76    @003/025

## 060503F07612



RE: John Magee                                                        NMR#: D66422.01
Page 2                                                                May 3, 2006

This is a medical review in regards to a long-term disability determination for John Magee. Specifically, the case is being reviewed in regards to the diagnosis of rheumatic disease. This review is based solely upon objective medical records. I have never examined, evaluated, or followed Mr. Magee, nor has there ever been a doctor-patient relationship between myself and Mr. Magee.

Mr. Magee is a 46-year-old male that has been out at work since 11/27/2003. His occupation is as a quality assurance engineer. In reviewing the medical record, the diagnoses predominating are those of chronic fatigue syndrome, fibromyalgia, restless legs syndrome, and a host of symptoms including fatigue, headaches, dysesthesias, multiple cognitive problems, diffuse abdominal discomfort, and chronic back pain. In the medical records, these problems are reported by him to produce symptoms of a severity as to produce difficulty with function in his vocation.

According to the available record data, symptomatology began in 1995 with an insidious onset of problems. The reports documented in the medical records are that subjective gradual worsening in symptoms has ensued to the point that he felt he could no longer perform his occupational duties. In reviewing the entire medical record data, there is no evidence of any specific cardiopulmonary, GI, or specific neurological or renal disease. There is mention of him having "hypovolemia" and he receives saline intravenous infusions on several occasions with equivocal responses.

Mr. Magee's examinations contained within the objective medical record essentially reveal evidences of the above noted problems. No focal neurological findings are mentioned. He is noted to have diffuse and chronic fatigue with multiple other somatic symptoms, including abdominal pain, problems with concentration, short term memory, headaches, and lack of energy. No objective cardiac, pulmonary, or GI findings are mentioned other than the diagnoses noted above. There are no mentions of synovitis, weakness, atrophy, or objective functional changes as a result of any musculoskeletal findings in the history, exam, or laboratory testing reported. No specific findings supportive of any destructive rheumatic disease have been demonstrated in the available medical record data. There is mention of depression with tearfulness on multiple occasions, which is reportedly related to his "losses" of functional abilities.

Mr. Magee's evaluations have been extensive and appropriate. These have included findings of a normal CBC and chemistry profile. His ANA and RF were negative. His ESR has been normal. Electrodiagnostic studies performed on the upper extremities were normal. According to the medical data he had a muscle biopsy performed; however this report has not been included for review. It was reportedly negative. A B12 and a.m. cortisol was normal. Echocardiography revealed borderline LVH. Standard catecholamine testing was normal. An MRI of the spine (? Region) was negative.

Mr. Magee's treatment has been with NSAIDs, analgesics, anti-depressants, stimulants, tricyclics, clonazepam, and adjuvants; however, these were of no sustained benefit. He has had the saline infusions and a course of psychotherapy. No benefit is documented from this treatment.

Mr. Magee's clinical course over the medical record data reviewed reveals no sustained benefits from treatment or changes in the subjective findings despite treatment and despite being out of work.

**TELECONFERENCE:** This reviewer contacted Dr. Bell's office on 5/1/06 at 10:55 am and 11:30 am EST. After receiving a busy signal, this reviewer faxed a request to his office to call me in regards to the review on Mr. Magee. After not receiving a call back, this reviewer re-contacted him at 3:05

ML0169

# Appendix 6 (cont.)

Independent Physicians Consultant (IPC) Review - Dr. D. Dennis Payne



060503F07612

RE: John Magee                                                          NMB2: DSA527.01
Page 2                                                                   May 3, 2006

pm EST on 5/1/06 and was able to discuss Mr. Magee's case with him. His current position on Mr. Magee's case is much the same that he presented in the medical records reviewed. He felt Mr. Magee was not malingering or amplifying his symptoms. He did report that that there was consistency in Mr. Magee's complaints and the subjective nature of the problems he reported. Dr. Ball also mentioned on questioning that no objective findings of joint or muscle damage or any objective musculoskeletal problem had been identified.

IN ANSWER TO YOUR SPECIFIC QUESTIONS:

1.  MetLife's focus is on defining Mr. Magee's level of functionality and abilities. Please define Mr. Magee's current level of functionality based on your review of all material provided, medical documentation and/or physical examination according to DOT physical demands.

The objective medical record presently supports that Mr. Magee is capable of performing unrestricted work duties consistent with the capabilities of age matched controls. Specifically, there are no restrictions or limitations that are supported in the available medical record data.

2.  How consistent with the clinical evidence presented is the stated diagnosis?

The diagnosis felt in the medical record data to be the disabling problem is chronic fatigue syndrome. This diagnosis is based entirely upon subjective symptomatology without any objective findings on examination, laboratory testing, imaging data, or other specific objective studies used to evaluate conventional disease. As a result, the "syndrome" designation is made in that this condition is a constellation of symptoms without any histopathological correlate. With that in mind, there is consistency with the clinical evidence (or lack thereof) with the stated diagnosis.

3.  How consistent with the objective clinical findings noted are the symptoms reported?

Entirely inconsistent. Mr. Magee presents with a host of multiple somatic symptoms and subjectively debilitating fatigue, with no objective reason being found. No specific treatments have lead to any sustainable improvements in symptoms or function.

4.  What restrictions and limitations would be appropriate based on the diagnosis?

No restrictions and limitations in function would be applicable to Mr. Magee's case

5.  How consistent is the treatment plan?

The available medical data support appropriate treatment for this condition consistent with the standard of care in the medical literature. As noted above, treatment failure is the normal course in this problem, with symptom palliation being all that is usually achievable in most cases. This would include activity limitation; it does not improve the problem.

ML0170

# Appendix 6 (cont.)

Independent Physicians Consultant (IPC) Review - Dr. D. Dennis Payne

05/03/2006  WED 12:53   FAX 615 399 3437  NER ELITE PHYSICIANS ... REVIEW1 NT ACS        ⌐005/035

060503F07612

RE: John Magee                                              NMBR: D0627.01
Page 4                                                          May 3, 2006

Sincerely,

D. Dennis Payne, Jr., M.D.
Board Certified Internal Medicine
Board Certified Rheumatology
Licensed in State of NC # 35459

ML0171

# Appendix 7

Dr. Bell's response to Dr. Payne's PFR

David S. Bell, M.D.
77 South Main Street
P.O. Box 495
Lyndonville, New York 14098

Telephone: (585) 765-2060

May 15, 2006

Metropolitan Life Disability
P.O. Box 14590
Lexington, Kentucky

RE:   John Magee
Claim #640407128904

Dear Sirs:

I am in receipt of your consultation from Dr. Dennis Payne on Mr. John Magee. I feel that this is quite inaccurate. First of all, in answer to question #1, I do not feel that Mr. Magee is capable of performing unrestricted work duties consistent with age-match controls. This statement shows a profound ignorance of the science involved with chronic fatigue syndrome which is inappropriate for a consultant. It should be noted that just this month the Centers for Disease Control published an entire journal on the genomics of this illness. While I would not be assuming that Dr. Payne is aware of the most recent evidence on chronic fatigue syndrome, the fact that it is an established diagnostic entity is beyond question. As regards question #4, the answer that there are no restrictions or limitations in function in Mr. Magee's case again makes the assumption that there is no such entity as chronic fatigue syndrome.

In the future I would expect that any independent consultant that Metropolitan Life employs to evaluate patients with this illness have at least a superficial understanding of this illness.

Very truly yours,

David S. Bell, M.D.

DSB:ds
Dictated, not read.
cc:  Mr. John Magee

ML0172

# Appendix 8

Dr. Payne's response to Dr. Bell's response to Dr. Payne's PFR

06/15/2006 THU 14:29  FAX 815 399 5437 NMR ELITE PHYSICIANS --- METLIFE BY ACS         @002/003

## 060615F08344



June 15, 2006

**Elite Physicians®,**
**Ltd.**

*A Subsidiary of*
**NMR**

*Providers of*
*Evidence-Based*
*Medical Records*

Ms. Michele McCann
Metlife Insurance
5950 Airport Road
Oriskany, NY 13424

RE:            John Magee
CLAIM #:      640407128904
SS #:          088544213
NMR #:        D56527.02

Dear Ms. McCann,

Thank you for submitting additional information.

**RECORDS PROVIDED FOR REVIEW:**
    PROG NOTES    Dr. Bell            4/10/06        1-2

**RHEUMATOLOGY ASSESSMENT:**  A thorough review of the additional submitted medical information has been completed.

This is an addendum to a medical review in regards to a long-term disability determination on Mr. Magee.  Specifically, the case is being reviewed in regards to the diagnosis of rheumatic disease.

Please see my initial review dated 5/3/2006 for a complete description of the reported findings.

Additional Data Reviewed: In addition to the medical records already reviewed, there is a letter from Dr. David S. Bell in response to my report of 5/3/06.  No additional objective medical findings are mentioned in regards to Mr. Magee.  The letter specifically mentions the entity chronic fatigue syndrome as an illness and the fact that it may not aware of its presence.

**TELECONFERENCE:**  A call was placed to Dr. Bell's office on 6/13/06 at 2:30 pm EST and again at 4:00 pm.  I was unable to discuss the case with Dr. Bell as he was out of the office at that time.

6774 Mill Road
Rockford, Illinois 61103

Phone:  815-399-3182
Fax:  815.399.5437

E-Mail:
info@elitephysicians.com

Visit our website
www.nmr-bis.com



# Appendix 8 (cont.)

Dr. Payne's response to Dr. Bell's response to Dr. Payne's PFR

06/15/2006 THU 14:26  FAX 815 399 9637 BHR ELITE PHYSICIANS ---> METLIFE BY ACB          ☑003/003

## 060615F08344

RE: John Magee                                              NMR#: DS6527.02
Page 2                                                      June 15, 2006

### IN ANSWER TO YOUR SPECIFIC QUESTIONS:

1. **Please review Dr. Bell's response to your physician file review, and determine if the additional information changes your opinion. If Dr. Bell's response does not change your opinion, please comment on what is lacking from the file to support a severity of impairment that prevents Mr. Magee from working.**

The response letter from Dr. Bell does not contain any additional information regarding the objective findings of any degree of disability present in Mr. Magee. The letter is in regard to my assumed lack of knowledge or acceptance of the diagnosis of chronic fatigue syndrome. The diagnosis of chronic fatigue syndrome is generally accepted in the medical literature and that acceptance is true in the opinion of this reviewer. It should be noted, however, that this diagnosis is a syndrome (constellation of symptoms) rather than an illness or disease as a result of there being no histopathophysiological correlate specific for the condition not present in controls. Further, it should be noted that even with a syndrome, as with a well defined illness or disease, there must be objective measures that support functional restrictions or limitations before limitations can placed on an individual. Therefore, my opinion in this review does not change from my previous report of 5/3/06.

This review is based solely upon objective medical records presented to me. I have never examined, evaluated, or followed Mr. Magee nor has there ever been a doctor-patient relationship between myself and Mr. Magee.

Sincerely,

D. Dennis Payne, Jr., M.D.
Board Certified Internal Medicine
Board Certified Rheumatology
Licensed in State of NC # 35459

ML0174

# Appendix 9

Case definition of Chronic Fatigue Syndrome on the CDC website (http://www.cdc.gov/cfs/cfsdefinitionHCP.htm)

(highlights are mine intended to point out relevant sections disputing Dr. Paynes assessment):

# The Revised Case Definition (abridged version)

...

## Introduction

...

## Guidelines for the Evaluation and Study of CFS

A thorough medical history, physical examination, mental status examination, and laboratory tests (diagram) must be conducted to identify underlying or contributing conditions that require treatment. Diagnosis or classification cannot be made without such an evaluation. Clinically evaluated, unexplained chronic fatigue cases can be classified as chronic fatigue syndrome if the patient meets both the following criteria:

1. Clinically evaluated, unexplained persistent or relapsing chronic fatigue that is of new or definite onset (i.e., not lifelong), is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial rEducation in previous levels of occupational, educational, social, or personal activities.
2. The concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours. These symptoms must have persisted or recurred during 6 or more consecutive months of illness and must not have predated the fatigue.

## Conditions that Exclude a Diagnosis of CFS

...

## Conditions that do not Exclude a Diagnosis of CFS

...

## A Note on the Use of Laboratory Tests in the Diagnosis of CFS

A minimum battery of laboratory screening tests should be performed. Routinely performing other screening tests for all patients has no known value. However, further tests may be indicated on an individual basis to confirm or exclude another diagnosis, such as multiple sclerosis. In these cases, additional tests should be done according to accepted clinical standards.

The use of tests to diagnose CFS (as opposed to excluding other diagnostic possibilities) should be done only in the setting of protocol-based research. The fact that such tests are investigational and do not aid in diagnosis or management should be explained to the patient.

ML0175

# Appendix 9 (cont.)

Case definition of Chronic Fatigue Syndrome on the CDC website (http://www.cdc.gov/cfs/cfsdefinitionHCP.htm)

In clinical practice, no tests can be recommended for the specific purpose of diagnosing chronic fatigue syndrome. Tests should be directed toward confirming or excluding other possible clinical conditions. Examples of specific tests that do not confirm or exclude the diagnosis of chronic fatigue syndrome include serologic tests for Epstein-Barr virus, enteroviruses, retroviruses, human herpesvirus 6, and Candida albicans; tests of immunologic function, including cell population and function studies; and imaging studies, including magnetic resonance imaging scans and radionuclide scans (such as single-photon emission computed tomography and positron emission tomography).

**Page last modified on May 5, 2006**

070308003416 0067

# Appendix 9 (cont.)

Case definition of Chronic Fatigue Syndrome on the CDC website (http://www.cdc.gov/cfs/cfsdiagnosisHCP.htm):

(highlights are mine intended to point out relevant sections disputing Dr. Paynes assessment):

# Diagnosis

...

### Diagnostic Challenges

Diagnosing chronic fatigue syndrome (CFS) can be challenging for health care professionals. A number of factors add to the complexity of making a CFS diagnosis: 1) there's no diagnostic laboratory test or biomarker for CFS, 2) fatigue and other symptoms of CFS are common to many illnesses, 3) CFS is an invisible illness and many patients don't look sick, 4) the illness has a remitting and relapsing course , 5) symptoms vary from person to person infrequency and severity, and 6) no two CFS patients have exactly the same pattern of symptoms.

### Overcoming the Challenges

In spite of these challenges, CFS can be diagnosed in a primary care setting. The 1994 International Case Definition for CFS forms the basis of a reliable diagnostic algorithm for CFS, particularly in adults.

While there is evidence that children can get CFS, current research suggests that the illness isn't prevalent in younger children, particularly those under the age of 11. Diagnosing pediatric CFS can be more difficult than adult CFS because children may have difficulty recognizing and verbalizing their symptoms, and because they have a remarkable ability to become accustomed to symptoms and adapt to them. Clinicians assessing adolescents for CFS should exercise judgment based on the course of the illness and the patient's medical history.

### How Physicians Diagnose CFS

If a patient has had 6 or more consecutive months of severe fatigue that is reported to be unrelieved by sufficient bed rest and that is accompanied by nonspecific symptoms, including flu-like symptoms, generalized pain, and memory problems, the physician should further investigate the possibility that the patient may have CFS. The first step in this investigation is obtaining a detailed medical history and performing a complete physical examination of the patient. Initial testing should include a mental status examination, which ordinarily will involve a short discussion in the office or a brief oral test. A standard series of laboratory tests of the patient's blood and urine should be performed to help the physician identify other possible causes of illness. If test results suggest an alternative explanation for the patient's symptoms, additional tests may be performed to confirm that possibility. If no cause for the symptoms is identified, the physician may render a diagnosis of CFS if the other conditions of the case definition are met (see What Is CFS?). A diagnosis of insufficient fatigue could be made if a patient has been fatigued for 6 months or more, but does not meet the symptom criteria for CFS.

...

Page last modified on May 9, 2006

# Appendix 9 (cont.)

Case definition of Chronic Fatigue Syndrome on the CDC website: (http://www.cdc.gov/cfs/cfssymptomsHCP.htm)

(highlights are mine intended to point out relevant sections disputing Dr. Paynes assessment):

# Symptoms

Chronic fatigue syndrome shares symptoms with many other disorders. Fatigue, for instance, is found in hundreds of illnesses, and 10% to 25% of all patients who visit general practitioners complain of prolonged fatigue. The nature of the symptoms, however, can help clinicians differentiate CFS from other illnesses.

...

**Primary Symptoms**

As the name chronic fatigue syndrome suggests, this illness is accompanied by fatigue. However, it's not the kind of fatigue patients experience after a particularly busy day or week, after a sleepless night or after a stressful event. It's a severe, incapacitating fatigue that isn't improved by bed rest and that may be exacerbated by physical or mental activity. It's an all-encompassing fatigue that results in a dramatic decline in both activity level and stamina.

People with CFS function at a significantly lower level of activity than they were capable of prior to becoming ill. The illness results in a substantial reduction in occupational, personal, social or educational activities.

A CFS diagnosis should be considered in patients who present with six months or more of unexplained fatigue accompanied by other characteristic symptoms. These symptoms include:

- cognitive dysfunction, including impaired memory or concentration
- postexertional malaise lasting more than 24 hours (exhaustion and increased symptoms) following physical or mental exercise
- unrefreshing sleep
- joint pain (without redness or swelling)
- persistent muscle pain
- headaches of a new type or severity
- tender cervical or axillary lymph nodes
- sore throat

**Other Common Symptoms**

In addition to the eight primary defining symptoms of CFS, a number of other symptoms have been reported by some CFS patients. The frequency of occurrence of these symptoms varies among patients. These symptoms include:

- irritable bowel, abdominal pain, nausea, diarrhea or bloating
- chills and night sweats
- brain fog
- chest pain
- shortness of breath

ML0178

# Appendix 9 (cont.)

Case definition of Chronic Fatigue Syndrome on the CDC website: (http://www.cdc.gov/cfs/cfssymptomsHCP.htm)

- chronic cough
- visual disturbances (blurring, sensitivity to light, eye pain or dry eyes)
- allergies or sensitivities to foods, alcohol, odors, chemicals, medications or noise
- difficulty maintaining upright position (orthostatic instability, irregular heartbeat, dizziness, balance problems or fainting)
- psychological problems (depression, irritability, mood swings, anxiety, panic attacks)
- jaw pain
- weight loss or gain

Clinicians will need to consider whether such symptoms relate to a comorbid or an exclusionary condition; they should not be considered as part of CFS other than they can contribute to impaired functioning.

**Clinical Course**

The severity of CFS varies from patient to patient, with some people able to maintain fairly active lives. By definiton, however, CFS significantly limits work, school and family activities.

While symptoms vary from person to person in number, type and severity, all CFS patients are functionally impaired to some degree. CDC studies show that CFS can be as disabling as multiple sclerosis, lupus, rheumatoid arthritis, heart disease, end-stage renal disease, chronic obstructive pulmonary disease (COPD) and similar chronic conditions.

CFS often follows a cyclical course, alternating between periods of illness and relative well-being. Some patients experience partial or complete remission of symptoms during the course of the illness, but symptoms often reoccur. This pattern of remission and relapse makes CFS especially hard for patients and their health care professionals to manage. Patients who are in remission may be tempted to overdo activities when they're feeling better, which can exacerbate symptoms and fatigue and cause a relapse. In fact, postexertional malaise is a hallmark of the illness.

The percentage of CFS patients who recover is unknown, but there is some evidence to indicate that the sooner symptom management begins, the better the chance of a positive therapeutic outcome. This means early detection and treatment are of utmost importance. CDC research indicates that delays in diagnosis and treatment may complicate and prolong the clinical course of the illness.

**Diagnostic Resources**

Several resources have been created to assist health care professionals in diagnosing and managing CFS. These resources can be accessed below:

- CFS Toolkit for Health Care Professionals

Page last modified on May 9, 2006

# Appendix 10

MetLife's own CFS Functional Assessment form

## METLIFE CHRONIC FATIGUE SYNDROME INITIAL FUNCTIONAL ASSESSMENT
**CLAIMANT: JOHN MAGEE     CLAIM NUMBER: 640407128904     EMPLOYER: ITT INDUSTRIES, INC.**

PROVIDER'S NAME _____     BOARD CERTIFIED SPECIALTY _____

PROVIDER'S SIGNATURE _____     TODAY'S DATE _____

PHONE NUMBER _____     FAX NUMBER _____

MANAGED CARE AFFILIATE FOR THIS CLIENT: _____

FIRST APPT. DATE: _____ LAST APPT. DATE: _____ NEXT APPT. DATE: _____

DATE YOU DETERMINED DISABILITY BEGAN: _____

| CURRENT ICD 9 CODE | DESCRIPTION (PLEASE DESIGNATE IF ACUTE OR CHRONIC) |
|---|---|
| PRIMARY TREATING CONDITION(S) | |
| DATE FIRST DIAGNOSED | |
| CDC CRITERIA MET? | |
| SECONDARY TREATING CONDITION | |
| DATE FIRST DIAGNOSED | |
| CRITERIA FOR CONDITION MET? | |
| OTHER MEDICAL | |
| PSYCHIATRIC CONDITION(S) | |
| DATE DIAGNOSED | |
| PSYCHOSOCIAL & ENVIRONMENTAL | |
| SIGNIFICANCE OF STRESSORS | |

**Please include office notes/testing results from _____ to present.**

### TREATMENT REGIMEN
**A. MEDICATIONS B. EXERCISE  C. LABS  D. RETURN TO WORK PLAN**
Please indicate use and/or prescription of Antidepressants, Narcotics, Sleep Medications, NSAIDS, Steroids; Injections; Acupuncture; Herbal Remedies; Over the Counter Medications; Ibuprofen/Naprosyn; Physical Therapy; Dietary/Nutritional supplements or restrictions; Exercise Regimen (equatherapy, walking, low impact aerobics); Other.
If "no" to any of the above please indicate rationale.

### A. MEDICATIONS: HISTORY AND CURRENT REGIMEN INCLUDING OTC

| PRESCRIBED/DOSAGE | RESPONSE/DATE ENDED |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ML0180