**EXHIBIT "D"**

## ADMINISTRATIVE SERVICES AGREEMENT
## ADMINISTRATIVE AND MANAGED DISABILITY SERVICES

Entered into by and among:

### METROPOLITAN LIFE INSURANCE COMPANY
### One Madison Avenue
### New York, New York  10010

### AND

### EASTMAN KODAK COMPANY
### 343 State Street
### Rochester, New York  14650

WHEREAS, Eastman Kodak Company sponsors and has adopted two long-term disability plans (the Kodak Pre-Flex Long-Term Disability Plan, plan number 506, which is effective for employees who became disabled prior to January 1, 1993, and the Kodak Long-Term Disability Plan, plan number 532, which is effective for employees who are disabled after December 31, 1992; both of which will be referred to collectively hereafter as the "Plan") to provide certain long-term disability benefits to eligible employees ("Participants"); and

WHEREAS, the Plan is an Employee Welfare Benefit Plan as that term is defined in and regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and

WHEREAS, the Board of Directors of Eastman Kodak Company has designated the Director, Pay and Benefits Services, US&C Human Resources as the Plan Administrator of the Plan pursuant to ERISA; and

WHEREAS, the Plan will offer a long-term disability benefits program to Participants; and

WHEREAS, a copy of the Summary Plan Description or other Plan Document describing the Plan has been made available to Metropolitan Life Insurance Company; and

WHEREAS, Eastman Kodak Company wants to contract with and delegate authority to Metropolitan Life Insurance Company to render certain services necessary in the administration of the Plan; and

WHEREAS, Metropolitan Life Insurance Company is willing to provide the services specified in this Administrative Services Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, it is agreed as follows:

ML  588

## ARTICLE I. DEFINITIONS

For the purposes of this Agreement:

1. **"Agreement"** means this Administrative Services Agreement and all Appendices attached hereto.

2. **"Corporate Customer"** means only the corporate entity known as Eastman Kodak. "Corporate Customer" is used in this Agreement to indicate the particular entity, which is obligated to meet or entitled to receive a specified financial obligation under this Agreement.

3. A **"Claim"** is a participant's request for benefits under the terms of the plan.

4. **"Customer"** means Corporate Customer or the directors, officers, employees, agents, independent contractors, committees or subsidiaries (not including Metropolitan Life Insurance Company) to whom the Corporate Customer has delegated authority to act in connection with this Agreement or the Plan. "Customer" is used in this Agreement to reflect the Parties' understanding that the Corporate Customer fulfills its obligations in connection with this Agreement and the Plan through its [own or its subsidiaries'] directors, officers, employees, agents, or committees.

5. **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

6. **"Experience Period"** means a period beginning on January 1 of a calendar year and ending on the next following December 31. In no event, however, will an Experience Period include any period of time beyond the date of termination of this Agreement.

7. **"First Experience Period"** means the period beginning January 1, 1999 and ending December 31, 1999.

8. **"MetLife"** means Metropolitan Life Insurance Company and any directors, officers, employees, agents, committees, or subsidiaries to which Metropolitan Life Insurance Company has delegated authority to act in connection with this Agreement or the Plan. "MetLife" is used in this Agreement to reflect the Parties' understanding that Metropolitan Life Insurance Company fulfills its obligations in connection with this Agreement and the Plan through its own or its subsidiaries' directors, officers, employees, agents, or committees.

9. **"MetLife Corporate"** means only the corporate entity known as Metropolitan Life Insurance Company exclusive if its directors, officers, employees, agents, committees, or subsidiaries. "MetLife Corporate" is used in this Agreement to indicate the particular entity which is obligated to meet or is entitled to receive a specified financial obligation under this Agreement.

ML 589

10.    **"Named ERISA Claims Review Fiduciary"** means the individual or entity designated by the Plan Administrator as the appropriate named fiduciary charged with the discretionary authority for determining eligibility for Plan Benefits and for interpretation of Plan terms in connection with the full and fair review of Claims which have been denied in whole or in part, which review is required under ERISA Section 503.

11.    **"Participant"** means a current or former employee of Eastman Kodak Company who is eligible and enrolled for coverage under and subject to the Plan's terms.

12.    **"Party(ies)"** means a signatory(ies) to this Agreement.

13.    **"Plan"** means the Kodak Long-Term Disability Plan and Kodak Pre-Flex Long-Term Disability Plan.

14.    **"Plan Administrator"** means the person, committee, or institution designated as such by the terms of the instrument under which the Plan is operated, to control and manage the operation and the administration of the plan.

15.    **"Plan Benefits"** mean Long Term Disability Benefits provided under the Plan.

ML 590

## ARTICLE II : SERVICES TO BE PROVIDED

SECTION A.  ADVISORY SERVICES

1.    MetLife will furnish advice regarding:

    a.    Plan design and revisions, including questions regarding eligibility for participation and effective dates and cessation of participation.

    b.    Procedures for verification of eligibility for participation under the Plan.

    c.    Plan administration including questions regarding taxes and Plan coverage.

    d.    Preparation of standard forms required under ERISA.

    e.    Plan documents including Summary Plan Description and other material intended for distribution to Participants.

2.    MetLife will prepare the following reports on the financial experience under the Plan:

    a.    Weekly summaries of amount of drafts, checks or Electronic Funds Transfers ("EFTs") drawn, voided, refunded and paid.

    b.    Monthly reconciliation of weekly summaries.

    c.    Monthly reports of Plan Benefits paid.

    d.    Monthly and annual summaries of drafts, checks and EFTs not presented for payment or canceled.

3.    MetLife will assist in establishing banking arrangements for the payment of Plan Benefits.

4.    If requested in writing by the Customer, MetLife will prepare and file reports to comply with escheat laws.

5.    MetLife will prepare and file reports and furnish statements to health care providers as required by the U.S. Department of Treasury Internal Revenue Service.

ML 591

## SECTION B. ACTUARIAL AND TECHNICAL SERVICES

1.  At the close of each Experience Period, MetLife will furnish estimates of the Plan's liability for open and unreported claims for Plan Benefits.

2.  MetLife will furnish annually an estimate, for budget purposes, of Plan Benefit cost and fees for the subsequent Experience Period.

3.  MetLife will furnish certain Plan Benefit cost calculations for proposed changes in the Plan.

## SECTION C. MANAGEMENT REPORTS AND DATA

1.  MetLife will prepare and provide those management reports agreed upon by the parties.

## SECTION D. CLAIM PAYMENT SERVICES

1.  MetLife will furnish advice and assistance on procedures and provide standard forms necessary for the submission and processing of claims.

2.  Plan Administrator hereby delegates to MetLife the authority to interpret and construe the terms of Plan to determine whether a Claim is properly payable, and to compute and verify Plan Benefit amount and duration.

3.  MetLife's evaluation of Claims may include review by medical and vocational professionals employed or retained by MetLife.

4.  MetLife will compute and verify Plan Benefit amounts and prepare and furnish to Participants, when appropriate, statements reflecting the amount of Plan Benefits payable.

5.  MetLife will draw drafts, checks or EFTs to Participants in payment of Plan Benefits.

6.  MetLife will notify Participants of Claims denied, in whole or in part, and the reason(s) for the denial, in accordance with the terms of the Plan and applicable ERISA requirements.

7.  MetLife will provide the Named ERISA Claims Review Fiduciary (if other than MetLife) with information and documents within MetLife's control needed to facilitate the full and fair review of a Claim on appeal, in accordance with the terms of the Plan and applicable ERISA requirements.

8.  Unless the parties agree otherwise in writing, MetLife will perform any other function delegated to the claims administrator in the Plan document, provided that such document and any relevant amendments thereto are made available to MetLife.

ML 592

9.   MetLife will comply with the performance standards provided for in Appendix LTD Performance Standards (subject to amendment upon agreement of the parties in the event of changes to applicable ERISA regulations).

10.  MetLife will maintain all records associated with denied claims for Plan Benefits for a period of at least six (6) years from initial denial or denial on appeal, whichever is later. MetLife will maintain all records associated with approved claims for Plan Benefits for a period of at least six (6) years from the date the individual is no longer receiving Plan Benefits.

## SECTION E. DISABILITY BENEFITS CLAIM PAYMENT SERVICES

1.   To the extent required by law, MetLife will provide for the withholding of FICA, Federal, State, and/or local income taxes from disability benefit payments, and for remittances of amounts withheld to the Internal Revenue Service and/or appropriate state or local tax authorities.

2.   To the extent required by law, MetLife will provide reports on taxable disability income, and the amounts withheld on account of FICA, Federal, State, and/or local income taxes, both as payment of benefits are made, and as the end of the calendar year. Prior to the start of each calendar year, Customer will provide to MetLife a written statement indicating the portion of the cost of the disability benefits paid for by the Customer and the portion of that cost paid for by its employees.

3.   At the request of Customer or Plan Administrator, and at additional cost to Customer, MetLife will prepare individual income tax reports (Form W-2) for each participant showing taxable disability benefits paid and amounts withheld, and deliver those reports to Customer for distribution to the relevant participant, the Internal Revenue Service, and/or appropriate state or local tax authorities.

4.   MetLife will furnish advice to claimants entitled to receive long-term disability benefits on how to apply for United States Social Security Disability Insurance benefits.

5.   MetLife will administer the reduction of long-term disability benefits in accordance with the provisions of the Plan and its discretionary authority.

6.   MetLife will obtain Customer's portion of FICA and Medicare tax payments from The Chase Manhattan Bank Account numbers 002-1-025762 for the Pre-Flex Long-Term Disability Plan and account number 002-2-421184 for the Long-Term Disability Plan, and deposit such portion under MetLife's EIN with the appropriate authority.

7.   MetLife will prepare and submit quarterly 941 forms for Customer's portion of FICA and Medicare tax payments under MetLife's EIN, and reconcile such 941 forms with the applicable W-2 forms on both a quarterly and annual basis.

ML 593

SECTION F. CLAIMS REVIEW

1.    Customer, Plan Administrator and MetLife acknowledge that the Plan Administrator hereby delegates to MetLife, and MetLife hereby agrees to assume, the responsibility and final discretionary authority for providing the full and fair review of determinations concerning eligibility for Plan Benefits, the interpretation of the amount and duration of Plan Benefits and the interpretation of Plan terms in connection with the appeal of Claims denied in whole or in part, required under ERISA Section 503 and, therefore, MetLife is the Named ERISA Claims Review Fiduciary. It is the intent of the Parties to this agreement that any determination or interpretation made by MetLife pursuant to this final discretionary authority shall be given full force and effect and conclusive and binding upon all persons having or claiming to have any right or interest in or under the Plan. It is the intention of the Parties to this agreement that the arbitrary and capricious standard of review should be applicable in any judicial proceeding related to any claim determination hereunder.

2.    Customer, Plan Administrator and MetLife agree that in fulfilling its responsibility as Named ERISA Claims Review Fiduciary, as discussed in (1) above, MetLife will designate a separate individual or individuals, completely distinct and independent from the individual or individuals responsible for the initial Claim determination.

3.    Customer, Plan Administrator and MetLife will cause notice of the availability of the ERISA Claim review procedure to be provided to Participants.

4.    Customer and Plan Administrator will provide MetLife with information and documents within their respective control needed to facilitate the full and fair review of a Claim on appeal.

7

ML 594

## ARTICLE III. SPECIAL BANKING ARRANGEMENTS

### SECTION A. ESTABLISHING AN ACCOUNT OR ACCOUNTS

To implement this Agreement, Eastman Kodak Company must establish a special bank account, or accounts if required, with the Chase Manhattan Bank, N.A., New York, New York  ("Chase") into which Eastman Kodak Company will ensure that funds are deposited and from which individuals authorized by MetLife will be authorized to draw drafts, checks, or electronic transfers ("EFTs") to pay Plan Benefits (each of which is referred to as "Account").

### SECTION B. BANK DEPOSITS

Eastman Kodak Company will ensure that deposits are made into the Account in such amounts and at such intervals as are required to discharge Eastman Kodak Company's liabilities for Plan Benefits. The amounts and frequency of such deposits will be determined by Eastman Kodak Company based on information provided by MetLife to Eastman Kodak Company and be made by transfer from Eastman Kodak Company's corporate account at Chase.

### SECTION C. INSUFFICIENT BANK BALANCES

1.    If the Accounts' deposit balance is insufficient to cover drafts, checks or EFTs presented to pay Plan Benefits, the Account will be deemed to be in "Overdraft" status. In the event of an Overdraft, MetLife has the right to suspend the performance of its services under this Agreement including Claim Processing Services. Any such suspension in service(s) shall not in any way be considered as a failure by MetLife to meet any or all Performance Guarantees and the determination of whether MetLife has met any or all Performance Guarantees shall not take into consideration any delays or omissions by MetLife arising from the suspension of service(s) under these circumstances.

2.    Under no circumstances is MetLife required to advance funds to cover an Overdraft. However, MetLife may, in its sole discretion, elect to advance its own funds to cover an Overdraft.

3.    If, in its sole discretion, MetLife has advanced its own funds to cover an Overdraft, Eastman Kodak Company agrees to repay MetLife the full amount advanced by MetLife plus "Additional Charges" calculated by adding seven (7) percentage points to the average of rates fixed at the first weekly auction of six (6) month Treasury bills in each month of the then current Contract Period. Eastman Kodak Company agrees that the Additional Charges will be applied to the outstanding Overdraft balance (for which MetLife has advanced its own funds) on a per diem basis for each day the Account was in an Overdraft status. MetLife reserves the right to change the formula for calculating these additional charges subject to mutual

8

agreement with the Corporate Customer. Any such new formula for Additional Charges will be effective as of the thirtieth (30th) day following the date that Eastman Kodak Company and MetLife mutually agree to these changes.

4.    The Additional Charges will not be imposed by MetLife unless all three (3) of the following conditions are met:

    a.    The total amount overdrawn exceeds three (3) days' average drafts paid per month, and

    b.    The Account is overdrawn on more than three (3) days during a month; and

    c.    The sum of positive balances for the month is less than three (3) times the value of the overdrafts for that month.

5.    Eastman Kodak Company acknowledges that MetLife reserves the right to change the conditions under which the Additional Charges will not be imposed. The new conditions will be effective as of the thirtieth (30th) day following the date of written notice by MetLife to Eastman Kodak Company.

6.    Eastman Kodak Company agrees to pay MetLife the full amount of any amount advanced by MetLife to cover Overdrafts as well as the Additional Charges within thirty (30) days following the date of Eastman Kodak Company's dated notice from MetLife of the amount of payment due.

## SECTION D. BANK CHARGES

All bank charges imposed by Chase for customary banking services, including the maintenance of the Account, processing of deposits, and processing of drafts, checks, or EFTs, will be paid by MetLife and are included in the Monthly Service Fee. Except as provided in Section C of this Article, MetLife will not impose any other charge with respect to the Account. If Eastman Kodak Company requests any additional services from Chase with respect to the Account, it will pay Chase for any charges incurred for those services.

## SECTION E. BANK AGREEMENTS

The identification of the Account, nature and frequency of Bank reports on Account activity, mechanics of processing individual drafts, checks, or EFTs, information appearing on drafts, checks or EFTs and retention of accepted drafts, checks, or EFTs must be agreed to by Eastman Kodak Company, MetLife and Chase or such other bank at which the Account is established.

ML 596

## ARTICLE IV: FEES

SECTION A. AGGREGATE SERVICE FEE

1. EXPERIENCE PERIOD

For the First Experience Period, Corporate Customer will pay MetLife Corporate the fee described in this Paragraph which will constitute the "Aggregate Service Fee":

| | |
|---|---|
| Monthly Flat fee | $ 6,667 |
| Monthly Claim Admin. Fee | $31,733 |
| Monthly Medical/Inspections* | $16,667 |
| Monthly Appeal  Processing Fee | $ 3,450 |

\* The Medical/Inspections amount is a budgeted amount that is charged on as an incurred basis quarterly.

2. SUBSEQUENT EXPERIENCE PERIODS

For each Experience Period other than the First Experience Period, MetLife Corporate and Corporate Customer may, by mutual agreement, change the Aggregate Service Fee. Only one such change will be permitted for each Experience Period (except for Adjustments described below) and such change will be effective as of the later of (a) the date the Experience Period begins or (b) the date thirty (30) days following the date of such Agreement.  Fees for subsequent experience periods are documented in the Fee Appendix to this Agreement.

3. ESTIMATED SERVICE FEE

As of the beginning of each Experience Period, Customer will be notified by MetLife of MetLife Corporate's estimated Aggregate Service Fee for that Experience Period ("Estimated Service Fee").

4. TENTATIVE MONTHLY SERVICE FEE

A prorated portion of the Estimated Service Fee is due to MetLife Corporate each calendar month of the Experience Period ("Tentative Monthly Service Fee"). The Tentative Monthly Service Fee for the first month this Agreement is in effect is due and payable on or before this Agreement's effective date. The Tentative Monthly Service Fee for each subsequent calendar month is due on the first (1st) day of that calendar month and must be received by MetLife on or prior to its due date. In the event a Tentative Monthly Service Fee is not received when due, Corporate Customer has thirty (30) days

ML 597

from the due date to make such payment. If Corporate Customer does not provide such funds within the thirty-day period, MetLife may, in its sole discretion, suspend any further Plan Benefit payments.

## 5. ADJUSTMENT OF TENTATIVE MONTHLY SERVICE FEE

During each Experience Period, the Aggregate and Tentative Monthly Service Fee may be adjusted, as deemed appropriate by MetLife and reviewed and agreed to by Corporate Customer, in the event of-

   a.    An increase or decrease of fifteen percent (15%) or more in the number of Participants; or

   b.    Any change in the Plan, which MetLife anticipates, may increase or decrease the amount of Plan Benefits payable thereunder by fifteen percent (15%) or more.

## 6. NOTICE OF AGGREGATE SERVICE FEE

Following the end of each Experience Period, MetLife will send written notice to Customer of the actual Aggregate Service Fee for that prior Experience Period. If the Aggregate Service Fee exceeds the total amount of Tentative Monthly Service Fees payable for that prior Experience Period, Corporate Customer will pay the excess to MetLife Corporate within thirty (30) days following mailing of notice to Customer of the amount payable. If the total amount of Tentative Monthly Service Fees paid exceeds the Aggregate Service Fee, MetLife Corporate will return the excess to Corporate Customer within thirty (30) days following the mailing of written notice to Customer of the amount of such excess.

## SECTION B. ADDITIONAL FEES

Corporate Customer will pay to MetLife Corporate the fees for services (if any) which are in addition to and are not included in the Aggregate Service Fee provided that Corporate Customer agrees to such fees prior to the performance of any services for which additional fees are necessary. Payment of these fees is due within thirty (30) days following mailing of written notice to Customer of the amount of fees payable.

## SECTION C. LATE PAYMENT CHARGE

1.    If MetLife does not receive a payment on or before its due date, the unpaid amount is subject to a "Late Payment Charge". The Late Payment Charge will be assessed each day beginning on the day after the payment due date and ending the day MetLife receives payment. The Late Payment Charge will be calculated by adding seven (7) percentage points to the average of the rates fixed at the first weekly auction of six (6) month Treasury bills in each month of the then current Contract Period.

ML 598

2.  MetLife reserves the right to change the formula for calculating the Late Payment Charge, but in no event will it exceed MetLife's Index Rate (based upon Treasury Bills) + 15%. The new Late Payment Charge formula will be effective as of the thirtieth (30th) day following the date of the notice to Corporate Customer of such changes.

3.  MetLife may waive a Late Payment Charge if payment of a Tentative Monthly Service Fee or any other fee or charge due under this Agreement is received by the fifteenth (15th) day following its due date. Any such waiver will not prejudice MetLife Corporate's right to receive a Late Payment Charge on other Tentative Monthly Service Fees or any other fee or charge due under this Agreement.

## SECTION D. TAXES

1.  If at any time, during or after the term of this Agreement, MetLife is required to pay any federal, state, or local taxes based upon or measured by the amount of fees paid or payable to MetLife Corporate for services provided under this Agreement ("Taxes") Corporate Customer will pay MetLife Corporate an additional amount equal to the Taxes. The federal, state and local Taxes described in the preceding sentence shall not include any income or similar tax imposed on MetLife.

2.  Corporate Customer will pay these additional amounts to MetLife Corporate within sixty (60) days following the date of written notice to Customer of the additional amounts due. Payments not received within the sixty (60) day period are subject to the Late Payment Charge.

3.  Corporate Customer will pay these additional amounts even if the validity of the Taxes has not been finally determined. If it is finally determined that such Taxes were not valid, MetLife Corporate will refund to Corporate Customer an amount equal to those additional amounts previously paid by Corporate Customer plus interest determined in accordance with MetLife Corporate's regular procedures then in effect, less a pro rata share of any expenses incurred by MetLife in contesting the validity of such Taxes.

ML 599

## ARTICLE V: GENERAL PROVISIONS

### SECTION A. ENTIRE CONTRACT MODIFICATIONS

This Agreement constitutes the entire contract between the Parties and is intended to supersede any and all prior written or verbal agreements or representations by **or** among the Parties with respect to the subject matter of this Agreement. No modification or amendment of this Agreement shall be valid unless made in writing and signing by a duly authorized officer of each of the Parties.

### SECTION B. APPLICABLE LAW

This Agreement and the obligations of the Parties shall be governed by and construed in accordance with ERISA. If it is determined by a court of competent jurisdiction that ERISA does not apply, the law of the State of New York will control.

### SECTION C. SURVIVAL

Unless otherwise specifically provided in this Agreement, the obligations of the Parties shall survive termination of this Agreement when necessary to effect the intent of the Parties as herein expressed.

### SECTION D. LIABILITY FOR PLAN BENEFITS

Liability for Plan Benefits is always Corporate Customer's obligation. In no event is MetLife liable for Plan Benefits. MetLife does not insure Plan Benefits or the Participants.

### SECTION E. INDEPENDENT CONTRACTOR STATUS

MetLife acts in the capacity of independent contractor in fulfilling MetLife Corporate's obligations in connection with this Agreement and the Plan.

### SECTION F. ERISA FIDUCIARY RESPONSIBILITIES

To the extent that MetLife, Customer, or Plan Administrator has undertaken the discretionary responsibility of a 'fiduciary' as this term is defined under ERISA, each will fulfill its fiduciary duties solely in the interest of the Participants for the exclusive purpose of facilitating the provision of Plan Benefits to Participants in accordance with the terms of the Plan and defraying its reasonable expenses of administering the Plan. Each will exercise its fiduciary duties with the care, skill, prudence and

ML 600

diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims in accordance with the terms and conditions of the Plan.

SECTION G. CONFIDENTIALITY/ DISCLOSURE

1.  Customer and MetLife acknowledge that in fulfilling obligations in connection with this Agreement and the Plan they may disclose or make available to each other statistical and other information which is commercially valuable, confidential, proprietary or trade secret ("Confidential Information").

2.  Customer and MetLife each agree to make every reasonable effort to: (a) identify to each other Confidential Information at the time of its disclosure; and (b) fully protect and preserve the confidential, proprietary and trade secret nature of each other's Confidential Information.

3.  Customer and MetLife each agree not to use, distribute or exploit each other's Confidential Information, in whole or in part, for its own benefit or that of any third party and will not disclose such Confidential Information to any other person, firm or entity without each other's prior written consent.

4.  MetLife agrees to keep confidential all employment information and other data relating to Customer and its employees, claims procedures, accounts, experience and methods developed and used for this Agreement, it being expressly agreed that all such documents, records, reports and data, including data recorded in MetLife's data processing systems related to the receipt, processing and payment of claims and claim histories shall at all times be property of Customer, subject to MetLife's right to possession and use during the continuance of this Agreement for the purposes of fulfilling its obligations under this Agreement. MetLife shall not make use of Customer's name, trademarks or trade names without Customer's prior written consent.

    MetLife shall not reveal any individually identifiable medical information to any person other than Customer or the Plan Administrator without first receiving the proper authorization from the individual person involved. Such proper authorization will comply with the laws of the state of residence of the individual in question.

5.  MetLife agrees to use the same precautions as it uses with relation to its insurance business to keep all records relating to Customer, the Plan, Customer's employees, their medical records and all other personal, financial and employment information confidential.

ML 601

## SECTION H. COMMUNICATIONS

1.  Customer and Plan Administrator will provide MetLife with statistical and other information which MetLife may need to perform services in connection with this Agreement and the Plan in such forms and at such intervals as are mutually acceptable to the Customer and MetLife.

2.  Customer will make every reasonable effort to provide MetLife with adequate advance written notice of Plan design changes. Customer and Plan Administrator agree that reasonable advance notice is necessary to provide MetLife with an adequate period of time in which to make adjustments which may reasonably be necessary to administer those changes as of their effective date. Customer will make available to MetLife copies of all Plan Description amendments and modifications.

3.  MetLife will make every reasonable effort to provide Customer and Plan Administrator with reasonable advance written notice of material changes in MetLife's services or operations, which would materially affect the nature or services provided by MetLife in connection with this Agreement and the Plan.

4.  The name of the Plan shall be used in all employee communication materials, which the Parties have agreed to tailor specifically for the Customer.

5.  All communications developed by MetLife specifically for Customer and any formal advertising or promotional pieces that specifically refer to the Plan must receive Customer's approval prior to release.

6.  All communications developed by Customer or Plan Administrator, which specifically refer to MetLife, must receive MetLife's approval prior to release.

## SECTION I. OVERPAYMENTS OF PLAN BENEFITS

1.  The Parties will cooperate fully to make every reasonable effort under the circumstances, considering the chances of successful recovery and the costs thereof, to recover any payment made to a Participant or Plan beneficiary which is in excess of the amount which the person was entitled to receive under the Plan ("Overpayments").

2.  MetLife will pursue all reasonable means of recovery of Overpayments agreed to by the parties.

3.  MetLife Corporate will assume liability for an unrecovered Overpayment only if and at such time as it is determined that: (a) the Overpayment was caused by a MetLife act or omission which was negligent, fraudulent, or criminal; (b) all reasonable means of recovery under the circumstances have been exhausted; and (c) MetLife's acts or omissions were not undertaken at the express direction of customer or Plan Administrator.

ML 602

SECTION J. PLAN BENEFITS LITIGATION

1.  If a demand is asserted or litigation, proceedings or arbitration is commenced by a Participant or Plan beneficiary to recover Plan Benefits ("Plan Benefits Litigation") against MetLife:

    a.  MetLife will provide written notice to Customer as soon as practicable, but in no event more than 60 days after MetLife receives notice of Plan Benefits Litigation and will, at reasonable intervals not to exceed 180 days, provide Customer with information with respect to the status of the Plan Benefits Litigation;

    b.  MetLife will select and retain counsel and will assume liability for the payment of MetLife's legal fees, costs and disbursements in connection with Plan Benefits Litigation;

    c.  Upon notice to terminate this Agreement by either party for any reason, MetLife's defense obligations described in paragraph 1.b. of this SECTION will terminate as to Plan Benefits Litigation commenced after the date on which this Agreement is terminated ("future Plan Benefits Litigation"). Notwithstanding, MetLife will continue to provide Customer, Plan and/or Plan Administrator with reasonable cooperation in the defense of future Plan Benefits Litigation;

    d.  Customer, Plan, Plan Administrator will provide MetLife with reasonable cooperation in the defense of Plan Benefits Litigation;

    e.  Corporate Customer is liable for the full amount of any Plan Benefits paid as a result of Plan Benefits Litigation as well as any legal fees and costs recovered by the Participant or Plan beneficiary in connection therewith, except where the Plan Benefits Litigation was the result of MetLife's breach of this Agreement or failure to exercise the standard of care set forth in Article V Section F, in which case, Plan Administrator shall not unreasonably deny MetLife authority to settle the lawsuit and such legal fees and costs only shall be borne by MetLife, unless authorization to settle was refused.

2.  If Plan Benefits Litigation is brought against Customer, Plan and/or Plan Administrator:

    a.  Customer, Plan and/or Plan Administrator will provide written notice to MetLife as soon as practicable, but in no event more than 60 days after Customer, Plan and/or Plan Administrator receive notice of Plan Benefits Litigation.

    b.  Customer and Plan Administrator will select and retain counsel and will assume liability for the payment of legal fees, costs and disbursements in connection with Plan Benefits Litigation brought against Customer, Plan and/or Plan Administrator;

    c.  MetLife will provide Customer and Plan Administrator with reasonable cooperation In the defense of Plan Benefits Litigation;

ML 603

      d.      Corporate Customer is liable for the full amount of any Plan Benefits paid as a result of Plan Benefits Litigation as well as any legal fees and costs recovered by the Participant or Plan beneficiary in connection therewith, except where the Plan Benefits Litigation was a result MetLife's breach of this Agreement or failure to exercise the standard of care set forth in Article V Section F, in which case such legal fees and costs only shall be borne by MetLife unless Plan Administrator does not make reasonable efforts in good faith to settle the lawsuit.

3.      If Plan Benefits Litigation is brought against MetLife and Customer and/or Plan and/or Plan Administrator:

      a.      Each will provide the other written notice of the lawsuit as soon as practicable, but in no event shall such notice exceed the requirements for timely and proper removal of the matter to federal court;

      b.      Each party will select and retain their own counsel and will assume liability for the payment of their own legal fees, costs and disbursements in connection with Plan Benefits Litigation;

      c.      MetLife hereby agrees to assume the lead responsibility for managing the defense of such Plan Benefits Litigation, including but not limited to, the preparation and filing of pleadings, discovery, motions and/or appeals and any oral arguments in connection therewith, as well as any trial, arbitration or other proceeding arising out of Plan Benefits Litigation. MetLife shall have the right of first refusal in hiring local counsel to represent it. Customer, Plan and/or Plan Administrator shall have the option to share MetLife's counsel and all legal fees, costs, and disbursements, but may not prevent MetLife from using counsel of its choice;

      d.      Upon notice to terminate this Agreement by either party for any reason MetLife's defense obligation described in paragraphs 3.b. and 3.c. of this SECTION will terminate as to future Plan Benefits Litigation. Notwithstanding, MetLife will continue to provide Customer, Plan and/or Plan Administrator with reasonable cooperation in the defense of future Plan Benefits Litigation;

      e.      Each party will provide the other with reasonable cooperation in the defense of Plan Benefits Litigation;

      f.      MetLife hereby agrees not to resist any efforts on behalf of the Customer, Plan and/or Plan Administrator to have such Plan Benefits Litigation dismissed or discontinued against Customer, Plan and/or Plan Administrator;

ML 604

g.    Corporate Customer is liable for the full amount of any Plan Benefits paid as a result of Plan Benefits Litigation as well as any legal fees and costs recovered by the Participant or Plan beneficiary in connection therewith, except where the Plan Benefits Litigation was the result of MetLife's breach of this Agreement or failure to exercise the standard of care set forth in Article V Section F, in which case, Plan Administrator shall not unreasonably deny MetLife authority to settle the lawsuit and such legal fees and costs only shall be borne by MetLife, unless authorization to settle was refused.

4.    MetLife shall obtain the consent of the Plan Administrator prior to settling any Plan benefits Litigation and said consent shall not be unreasonably withheld.

SECTION K. INDEMNIFICATION OF CUSTOMER, PLAN OR PLAN ADMINISTRATOR

1.    For the Purposes of this Section:

"**Damages**" means settlements, awards and judgments (not including punitive damages) and reasonable legal fees, costs and expenses incurred by Customer, Plan or Plan Administrator to resolve a "Non-Party Claim."

"**Non-Party Claim**" means a demand asserted or litigation, proceedings or arbitration commenced by a person or entity who is not a Party to this Agreement, to obtain a settlement, award or judgment against Customer, Plan or Plan Administrator arising from an act or omission by MetLife in connection with this Agreement or the Plan.  A "Non-Party Claim" does not include any portion of an action brought to recover Plan Benefits.  The rights and obligations of MetLife, Customer, Plan and Plan Administrator with respect to Plan Benefits Litigation are described in the "Plan Benefits Litigation" Section of this Agreement.

2.    MetLife Corporate will indemnify Customer, Plan and/or Plan Administrator against Damages if and at such time as it has been determined that:

a.    Customer, Plan or Plan Administrator has incurred Damages arising from MetLife's breach of any provision of this Agreement or the dishonest, negligent, intentionally tortuous, fraudulent or criminal acts or omissions by MetLife in connection with this Agreement or the Plan; and

b.    The Damages did not arise from either the acts or omissions of Customer, Plan or Plan Administrator in connection with this Agreement or the Plan or from a MetLife act or omission undertaken at the express direction of Customer, Plan or Plan Administrator; and

18

ML 605

c.    Customer, Plan or Plan Administrator first received notice (oral or written) of the Non-Party Claim no later than 365 days after this Agreement terminated; and

d.    Customer, Plan or Plan Administrator provided written notice of the Non-Party Claim to MetLife as soon as practicable, but in no event more than 120 days, after Customer, Plan or Plan Administrator first received notice of the Non-Party Claim.

3.    MetLife does not carry Errors and Omissions Liability Insurance but rather self assumes this risk. MetLife does maintain Commercial General Liability Insurance and Crime Insurance in amounts in excess of $10 million dollars.

4.    Customer, Plan and Plan Administrator will have discretion to resolve a Non-Party Claim in a reasonable manner and amount under the circumstances. However, failure to act reasonably in resolving a Non-Party Claim will relieve MetLife Corporate of its obligations to indemnify only if and to the extent it has been prejudiced by this failure.

5.    Nothing in this Section of this Agreement is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, Plan beneficiaries and health care providers, any right, claim or cause of action against Customer, Plan, Plan Administrator or MetLife.

## SECTION L. INDEMNIFICATION OF METLIFE

1.    For the Purposes of this Section:

**"Damages"** means settlements, awards or judgments (not including punitive damages) and reasonable legal fees, costs and expenses incurred by MetLife to resolve a "Non-Party Claim."

**"Non-Party Claim"** means a demand asserted or litigation, proceedings or arbitration commenced by a person or entity who is not a Party to this Agreement, to obtain a settlement, award or judgment against MetLife arising from an act or omission by Customer, Plan or Plan Administrator in connection with this Agreement or the Plan. A "Non-Party Claim" does not include any portion of an action brought to recover Plan Benefits. The rights and obligations of MetLife, Customer, Plan and Plan Administrator with respect to Plan Benefits Litigation are described in the "Plan Benefits Litigation" Section of this Agreement.

2.    Corporate Customer will indemnify MetLife against Damages if and at such time as it has been determined that:

ML 606

a.    MetLife has incurred Damages arising from a dishonest, grossly negligent, intentionally tortuous, fraudulent or criminal act or omission or a breach of any provision of this Agreement by Customer, Plan or Plan Administrator in connection with this Agreement or the Plan; and

b.    The Damages did not arise from MetLife's own acts or omissions in connection with this Agreement or the Plan or from a Customer, Plan or Plan Administrator act or omission undertaken at MetLife's express direction; and

c.    MetLife first received notice (oral or written) of the Non-Party Claim no later than 365 days after this Agreement terminated; and

d.    MetLife provided written notice of the Non-Party Claim to Customer as soon as practicable, but in no event more than 120 days, after MetLife first received notice of the Non-Party Claim.

3.    MetLife will have discretion to resolve a Non-Party Claim in a reasonable manner and amount under the circumstances. However, failure to act reasonably in resolving a Non-Party Claim will relieve Corporate Customer of its obligations to indemnify only if and to the extent it has been prejudiced by this failure.

4.    Nothing in this Section of this Agreement is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, Plan beneficiaries and health care providers, any right, claim or cause of action against Customer, Plan, Plan Administrator or MetLife.


### SECTION M. LIMITATION ON ACTIONS

Any suit between or among MetLife, Customer, Plan, and Plan Administrator arising from obligations of any Party in connection with this Agreement or the Plan must be instituted within the applicable statute of limitations or two years from the date this Agreement terminates, whichever is shorter.


### SECTION N. AUDITS

At various times during each Experience Period, MetLife will make available for audit by either Customer or Plan Administrator (during normal business hours) its files, books and records pertaining to the Plan. There will be an additional charge to customer, determined by MetLife based upon its then current standard rates, for each additional audit over one per Experience Period, unless the additional audit(s) is/are the result of an increase or decrease in the number of claims determined to be properly payable of greater than 10%. If Customer or Plan Administrator retains the services of a third party to conduct an audit, MetLife will require that the third party execute a Confidentiality Agreement prior to commencing the audit.

ML 607

## SECTION O. WAIVER OF SET-OFF

With respect to disputes arising out of this Agreement MetLife shall have no lien on any assets of Customer, the Plan or any participant and MetLife waives any right of set-off, lien or similar right with respect to any such assets which arises by operation of law or otherwise.

## SECTION P. ATTORNEYS FEES

In the event that at any time after the date of this Agreement either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the party not prevailing in the action or proceeding shall reimburse the prevailing party for the reasonable expenses of attorneys' fees and all costs or disbursements incurred on any appeal from the action or proceeding.

## SECTION Q. ASSIGNABILITY

This Agreement shall not be assignable by either party and neither party may delegate its obligation hereunder to any other person without the specific written consent of the other party. Any assignment without the specific written consent of the other party is void, and the non-consenting party is not required to recognize or accept such assignment and any assignee shall acquire no rights by reason of the assignment.

## SECTION R. COUNTERPARTS

This Agreement may be executed in any number of duplicate originals, each of which shall be deemed an original, and said duplicate originals shall constitute but one and the same instrument.

ML 608

## ARTICLE VI. TERMINATION OF THE AGREEMENT

### SECTION A.  TERM OF AGREEMENT

This Agreement shall continue in effect during the first and each succeeding Experience Period unless terminated in accordance with this Article.

### SECTION B.  TERMINATION OF AGREEMENT

Notwithstanding any other term or condition of this Agreement, this Agreement will terminate on the earliest of:

1.  The 30th day following the date of written notice by Customer or MetLife to the other of the other's intention to terminate this Agreement; or

2.  The last day of a calendar month following the month for which a Tentative Monthly Service Fee or any other fee or charge due under this Agreement has not been paid when due. MetLife's failure to treat this Agreement as terminated in accordance with this Paragraph shall not be deemed to be a waiver of MetLife Corporate's right to treat this Agreement as terminated in accordance with this Paragraph as a result of a failure by Corporate Customer to pay, on a timely basis, any  subsequent Tentative Monthly Service Fee or other fee or charge due under this Agreement; or

3.  Any other date determined by written agreement among the Parties.

### SECTION C. OBLIGATIONS UPON TERMINATION OF AGREEMENT

1.  Upon termination of this Agreement, for any reason other than Corporate Customer's failure to pay any Tentative Monthly Service Fee or other fee or charge due under this Agreement, unless otherwise agreed by and among the Parties, MetLife will provide Claims Payment incurred by Participants and received by MetLife prior to the effective date of termination.

2.  Upon termination of this Agreement by MetLife because of Corporate Customer's failure to pay a Tentative Monthly Service Fee or any other fee or charge due under this Agreement, if agreed to by and among the Parties, MetLife will provide Claims Payment incurred by Participants and received by MetLife prior to the effective date of termination.

3.  Corporate Customer will continue to assure that deposits are made to the Account, subject to the same conditions as if this Agreement had not terminated, so that MetLife may draw drafts to make the payments described in this Article.

ML 609

4.   When all Plan Benefit payments have been made as described in this Article, MetLife will notify Customer so that the Account may be closed.

5.   Upon termination of this Agreement, MetLife will release to Customer at no cost, in MetLife's then standard format, all records and files relating to all Claims for Plan Benefits in its possession.

6.   MetLife Corporate's charges for services provided following termination of the Agreement must be agreed to by the parties prior to MetLife's rendering of such services, and are in addition to and are not included in the Aggregate Service Fee and will be based upon the Aggregate Service Fee for the final Experience Period.  All charges for services provided following termination of this Agreement are due and payable to MetLife Corporate within thirty (30) days following the date of notice to Customer of the amount payable and are subject to the Late Payment Charge.


### EXECUTION PAGE

**IN WITNESS WHEREOF**, the Parties have caused this Administrative Services Agreement to be executed in duplicate originals by there duly authorized officers, to take effect as of January 1, 1999.


_12/8/98_
Date

METROPOLITAN LIFE INSURANCE COMPANY
By: _____
Vice-President
MetLife


_12/2/98_
Date

EASTMAN KODAK COMPANY
By: _____
Senior Vice-President of Human Resources
Eastman Kodak Company


_12/2/98_
Date

_____
Plan Administrator
Kodak Long-Term Disability Plan
Kodak Pre-Flex Long-Term Disability Plan

ML 610